**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Sonya Evette SINGLETON,
Defendant–Appellant.**

No. 97–3178.

United States Court of Appeals,
Tenth Circuit.

July 1, 1998.

Order Granting Rehearing En
Banc July 10, 1998.

John V. Wachtel, Klenda, Mitchell, Austerman & Zuercher L.L.C., Wichita, Kansas, for Defendant–Appellant.

Michael G. Christensen, Assistant United States Attorney (Jackie N. Williams, United States Attorney, with him on the brief), Wichita, Kansas, for Plaintiff–Appellee.

Before SEYMOUR, Chief Judge, EBEL, and KELLY, Circuit Judges.

KELLY, Circuit Judge.

Section 201(c)(2) of Title 18 of the United States Code prohibits giving, offering, or promising anything of value to a witness for or because of his testimony. Defendant–Appellant Sonya Singleton argues the government violated this statute by promising leniency to a witness in return for his testimony against her. Ms. Singleton was convicted of one count of conspiracy to distribute cocaine, see 21 U.S.C. §§ 841(a)(1), 846, and seven counts of money laundering, see 18 U.S.C. § 1956(a)(1)(B)(I). The district court sentenced her to forty-six months imprisonment on each count, to be served concurrently, and to be followed by three years of supervised release.

Ms. Singleton appeals her convictions, arguing the district court erred (1) in denying her motion to suppress testimony allegedly obtained in violation of 18 U.S.C. § 201(c)(2) and Kansas Rule of Professional Conduct 3.4(b), and (2) in denying her motion for judgment of acquittal on both the conspiracy and money laundering counts. Our jurisdiction arises under 28 U.S.C. § 1291. We reverse and remand for a new trial.

*Background*

In April 1992, a detective of the Wichita Police Department contacted local Western Union agents to determine if drug dealers were using Western Union services to transfer drug money. He found a large number of wire transfers over $1000 which bore similar identifiers, including similar names of recipients, and similar names, addresses and phone numbers of senders. The records led authorities to a group of people whom they believed were involved in a conspiracy to sell drugs. Further investigation indicated the drug business was begun by men who had moved from California to Wichita. They recruited local women to wire proceeds of drug sales back to California to pay for more cocaine; some of these women also received wire transfers on behalf of the conspiracy and transported cocaine from California to Wichita. Ms. Singleton was identified as one

who transferred and received money for the conspiracy. She was the common-law wife of Eric Johnson, who regularly bought, packaged, and sold drugs, and she was listed as either the sender or recipient on eight wire transfers suspected to have been sent on behalf of the conspiracy. Handwriting experts confirmed that her handwriting was present on paperwork accompanying the eight wire transfers.

Ms. Singleton and others were charged in a superseding indictment with multiple counts of money laundering and conspiracy to distribute cocaine. Before trial she moved to suppress the testimony of Napoleon Douglas, a coconspirator who had entered into a plea agreement with the government. The basis for her motion was that the government had impermissibly promised Mr. Douglas something of value—leniency—in return for his testimony, in violation of 18 U.S.C. § 201(c)(2) and Kansas Rule of Professional Conduct 3.4(b), which prohibits offering unlawful inducements to a witness. The district court denied the motion, ruling that § 201(c)(2) did not apply to the government.

At trial Mr. Douglas testified against Ms. Singleton. He stated that the government, through an assistant United States attorney, had promised to file a motion for a downward departure if he testified truthfully. *See* IV R. 204–06. His testimony of the government's promise in this regard is somewhat confused, however, and in Mr. Douglas's written plea agreement the government made no firm promise to file a motion for a downward adjustment. The agreement merely stated the government would file a motion under USSG § 5K1.1 or 18 U.S.C. § 3553(e) if, in its sole discretion, Mr. Douglas's cooperation amounted to substantial assistance. *See* I R. doc. 109, at 2. Both the testimony and plea agreement make clear Mr. Douglas understood that the actual grant of any downward adjustment was entirely within the purview of the sentencing court.

The plea agreement does, however, state three specific promises made by the government to Mr. Douglas in return for his explicit promise to testify. *See id.* at 1–3. First, the government promised not to prosecute Mr. Douglas for any other violations of the Drug Abuse Prevention and Control Act stemming from his activities currently under investiga-

tion, except perjury or related offenses. *See id.* at 1–2. Second, it promised "to advise the sentencing court, prior to sentencing, of the nature and extent of the cooperation provided" by Mr. Douglas. *Id.* at 2. Third, the government promised "to advise the Mississippi parole board of the nature and extent of the cooperation provided" by Mr. Douglas. *Id.* Mr. Douglas agreed, "in consideration of the items listed in paragraph 2 above ... [to] testify[ ] truthfully in federal and/or state court...." *Id.* at 2–3.

### Discussion

The issues before us are (1) whether the government's conduct was prohibited either by § 201(c)(2) or Kansas Rule of Professional Conduct 3.4(b); (2) if it was, whether Mr. Douglas's testimony should have been suppressed; and (3) whether the record contains sufficient evidence to remand for a new trial.

### I. Statutory Construction of 18 U.S.C. § 201(c)(2)

### A. The Language and Plain Meaning

We review de novo the district court's interpretation of a federal statute. *See Utah v. Babbitt,* 53 F.3d 1145, 1148 (10th Cir.1995). Our inquiry begins with the language of the statute, *see Ardestani v. INS,* 502 U.S. 129, 135, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991), which "must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). "The 'strong presumption' that the plain language of the statute expresses congressional intent is rebutted only in 'rare and exceptional circumstances,' when a contrary legislative intent is clearly expressed." *Ardestani,* 502 U.S. at 135–36, 112 S.Ct. 515 (citation omitted) (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)). In the absence of that rare and exceptional circumstance, "we are bound to take Congress at its word." *Oubre v. Entergy Operations, Inc.,* — U.S. —, 118 S.Ct. 838, 841, 139 L.Ed.2d 849 (1998).

The Supreme Court has recently emphasized the primacy of statutory plain language. In *Salinas v. United States,* — U.S.

——, 118 S.Ct. 469, 473–74, 139 L.Ed.2d 352 (1997), the Court concluded that a bribe need not affect federal funds to violate the federal bribery statute, 18 U.S.C. § 666, because the "expansive, unqualified" plain language of the statute criminalized the acceptance of a bribe by a covered official in connection with "any" transaction involving $5,000 or more. *Id.* at 473, 118 S.Ct. 469. The statute made no mention of federal funds, and the court emphatically refused to rewrite Congress's enactment or judicially add elements to the crime. *See id.* at 473–75, 118 S.Ct. 469. Similarly, in *Brogan v. United States,* —— U.S. ——, 118 S.Ct. 805, 809, 139 L.Ed.2d 830 (1998), the Court invalidated the long-standing "exculpatory no" doctrine under 18 U.S.C. § 1001 "[b]ecause the plain language of § 1001 admits of no exception" for the doctrine. *Id.*, 118 S.Ct. at 812. Section 1001, which imposes criminal liability for making a false statement to federal investigators, had long been interpreted by the courts of appeal to exclude liability for a suspect's mere denial of wrongdoing. The Court, however, rejected "the broad proposition that criminal statutes do not have to be read as broadly as they are written," and stated:

> it is not, and cannot be, our practice to restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy—even assuming that it is possible to identify that evil from something other than the text of the statute itself.... Courts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so.

*Id.*, 118 S.Ct. at 809–12. Most recently, the Court in *Oubre* found that where a general waiver of all causes of action against an employer by an employee did not conform to specific enumerated requirements for waivers under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 626, the waiver did not release the employee's ADEA claims. *See Oubre,* 118 S.Ct. at 842. The Court wrote, "Courts cannot with ease presume ratification of that which Congress forbids." *Id.*, 118 S.Ct. at 841.

Section 201(c)(2) could not be more clear. It says:

> Whoever ... directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court ... authorized by the laws of the United States to hear evidence or take testimony ... shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C. § 201(c)(2). We note at the outset that § 201 is to be broadly construed to further its legislative purpose of deterring corruption. *See United States v. Hernandez,* 731 F.2d 1147, 1149 (5th Cir.1984); *United States v. Evans,* 572 F.2d 455, 480 (5th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978).

The class of persons who can violate the statute is not limited. "Whoever" completes the following elements commits a crime. 18 U.S.C. § 201(c)(2). First, the statute requires a gift, offer, or promise, either direct or indirect, to a person. *See id.* Second, the gift, offer, or promise must be "of value." *Id.* Third, the gift, offer, or promise must be made "for" or "because of" the person's sworn testimony at a trial or other proceeding before an authorized court. *Id.* The state of mind required to violate the statute is knowledge that the thing of value is given for or because of testimony. *See United States v. Campbell,* 684 F.2d 141, 150 (D.C.Cir.1982) (construing parallel subsection); *United States v. Brewster,* 506 F.2d 62, 82 (D.C.Cir.1974) (quoting *United States v. Brewster,* 408 U.S. 501, 527, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972)) (same).

The first issue facing us is whether the assistant United States attorney, acting on behalf of the government, is within the statutory class "whoever." The Supreme Court has recognized a limited canon of construction which provides that statutes do not apply to the government or affect governmental rights unless the text expressly includes the government. *See Nardone v. United States,* 302 U.S. 379, 383, 58 S.Ct. 275, 82 L.Ed. 314 (1937); *United States v. Herron,* 87 U.S. (20 Wall.) 251, 255, 22 L.Ed. 275 (1873). The canon applies only to two classes of cases,

however. *See Nardone,* 302 U.S. at 383, 58 S.Ct. 275. The first class in which the government is presumptively excluded from general statutory language involves statutes which would deprive the sovereign of "a recognized or established prerogative title or interest." *Id.* A classic example is the exemption of the sovereign from statutes of limitation. The second class is comprised of those statutes which would create an absurdity if applied to the government, as, for example, a speed limit applied to a policeman pursuing a suspect. *See id.* at 384, 58 S.Ct. 275.

Even if § 201(c)(2) could be said to deprive the sovereign of an established prerogative, two further exceptions remove § 201(c)(2) from this class of statutes. First, the presumption that the sovereign is excluded unless named does not apply "where the operation of the law is upon the agents or servants of the government rather than on the sovereign itself." *Id.* at 383, 58 S.Ct. 275. *See United States v. Arizona,* 295 U.S. 174, 184, 55 S.Ct. 666, 79 L.Ed. 1371 (1935); *Dollar Sav. Bank v. United States,* 86 U.S. (19 Wall.) 227, 239, 22 L.Ed. 80 (1873); *see also City of Buffalo v. Hanna Furnace Corp.,* 305 N.Y. 369, 376, 113 N.E.2d 520, 523–24 (1953). In the case before us, § 201(c)(2) does not restrict any interest of the sovereign itself; it operates only upon an agent of the sovereign, limiting the way in which that agent carries out the government's interests. "There is no presumption that regulatory and disciplinary measures do not extend to such officers. Taken at face value the language indicates the purpose of Congress to govern conduct of its own officers and employees as well as that of others." *Arizona,* 295 U.S. at 184, 55 S.Ct. 666 (holding that the Secretary of the Interior was clearly subject to a law prohibiting "any person" from constructing a dam on navigable waterways without the consent of Congress).

The second exception provides that the government is subject to a statute, even if it infringes upon a recognized government prerogative, if the statute's purpose is to prevent fraud, injury, or wrong. *Nardone,* 302 U.S. at 384, 58 S.Ct. 275; *Herron,* 87 U.S. (20 Wall.) at 255–56. *Nardone* itself relied upon

this principle to hold that federal agents were covered by the statutory term "anyone" in the 1934 federal wiretap statute. *See Nardone,* 302 U.S. at 382–84, 58 S.Ct. 275. The anti-gratuity provision of § 201(c)(2) indicates Congress's belief that justice is undermined by giving, offering, or promising anything of value for testimony. If justice is perverted when a criminal defendant seeks to buy testimony from a witness, it is no less perverted when the government does so. Because § 201(c)(2) addresses what Congress perceived to be a wrong, and operates to prevent fraud upon the federal courts in the form of inherently unreliable testimony, the proscription of § 201(c)(2) must apply to the government. *See id.* at 384, 58 S.Ct. 275. Further, the interests of the United States as sovereign militate in favor of applying § 201(c)(2) against federal prosecutors. The sovereign's interests are in the enforcement of its laws and the just administration of its judicial system; applying § 201(c)(2) to all parties in that judicial system advances both interests.

Having escaped the first class of cases in which the canon applies, we determine whether our case falls within the second: cases in which "public officers are impliedly excluded from language embracing all persons" because such a reading would "work obvious absurdity." *Id.* A brief overview of legal principles and the common law will confirm the rationality of the statute's result and indicate the scope of the tradition behind its application to the government. *See Kuzma v. IRS,* 821 F.2d 930, 932 (2d Cir.1987) ("[E]stablished principles of statutory construction compel us to seek a rational and sensible construction of the language in question. . . .").

One of the very oldest principles of our legal heritage is that the king is subject to the law. *See Romans* 13. King John was taught this principle at Runnymede in A.D. 1215, when his barons forced him to submit to Magna Carta, the great charter that imposed limits on the exercise of sovereign power. *See* William Sharp McKechnie, *Magna Carta,* 36–42 (1914). One of the first modern expositions of this hallowed principle is found in *Lex, Rex,*[1] whose title indicated

---

1. Samuel Rutherford, *Lex, Rex, or The Law and*     *the Prince* (1644) (Sprinkle Publications 1982).

the fundamental shift in our legal heritage toward the primacy of the law and the subordinate position of the king. Justice Brandeis expounded as follows on the principle:

> Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.

*Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). This venerable principle will not give way to the expediency of the government's present practices without legislative authorization. *See Arizona v. Maricopa County Med. Soc'y,* 457 U.S. 332, 354, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982).

The policy expressed in § 201(c)(2) has long been enforced at common law. *See Hamilton v. General Motors Corp.,* 490 F.2d 223, 227–28 (7th Cir.1973).[2] The public policy against payments to fact witnesses is expressed in the majority of states in both the law of contracts and in ethical rules, which we address below. The policy is weighty enough that contracts to pay fact witnesses are void as violative of public policy. *See* 6A Arthur Linton Corbin, *Corbin on Contracts* § 1430 (1962); *Restatement of Contracts* § 552(1) (1932); *Restatement (Second) of Contracts,* § 73 cmt. b (1981); 7 Richard A. Lord, *Williston on Contracts* § 15:6 (4th ed.1997). Such contracts also fail for lack of consideration. *See, e.g., Williston, supra,* at

§ 15:6. Every citizen has the legal duty to testify to facts within his knowledge, and any witness may be compelled to do so by subpoena and civil contempt proceedings. We note that agreements for testimony are not always used in federal prosecutions. In *United States v. Bambulas,* 471 F.2d 501, 505 (7th Cir.1972), the court held:

> From the testimony at trial and the sentences imposed on Bambulas and Russell, there is no indication that immunity or a promise of leniency had been offered by federal authorities to Russell. In addition, Fortner testified that federal agents had emphatically stated to him that there would be "no deals" as reward for his testimony.

*Id. See also United States v. Meinster,* 619 F.2d 1041, 1045 (4th Cir.1980). The judicial process is tainted and justice cheapened when factual testimony is purchased, whether with leniency or money. Because prosecutors bear a weighty responsibility to do justice and observe the law in the course of a prosecution, it is particularly appropriate to apply the strictures of § 201(c)(2) to their activities.

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape nor innocence suffer.

*Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 803, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987) (quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), *overruled on other grounds by Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960)). We conclude the statute's application to gov-

---

**2.** From the general rule against payments to fact witnesses, *Hamilton* excepts reimbursements for travel, subsistence, and the reasonable value of time lost in attendance. *Hamilton,* 490 F.2d at

227. These exceptions track 18 U.S.C. § 201(j), currently renumbered as § 201(d), which provide the corollary statutory exceptions from § 201(c)(2) for such reimbursements.

ernment officials, far from being absurd, is at the center of our legal tradition.

Because of our duty to harmonize apparently conflicting statutes whenever possible, *see Chemical Weapons Working Group, Inc. v. Department of the Army,* 111 F.3d 1485, 1490 (10th Cir.1997), we consider whether applying § 201(c)(2) to federal prosecutors works an absurdity in view ,of the federal immunity statute, 18 U.S.C. §§ 6001–6005. Although it could be argued that §§ 6001–6005 authorize federal prosecutors to give immunity for testimony while § 201(c)(2) criminalizes offering anything of value for testimony, we believe the statutes operate in sufficiently separate spheres to avoid both conflict and absurdity. The immunity statute allows removal of a witness's Fifth Amendment privilege so that a silent witness may be forced to speak. Under §§ 6001–6005 the government does not give immunity directly for the witness's testimony; the government may move the court to grant immunity, which in turn removes the witness's testimonial privilege so the ordinary compulsion may be brought to bear to require the witness to testify. Both statutes can operate fully and independently; together they manifest a Congressional intent to allow testimony obtained by the court's grant of immunity, but to criminalize the gift, offer, or promise of any other thing of value for or because of testimony. It is not necessary to our decision to further explore the interplay between §§ 6001–6005 and § 201(c)(2), and we leave for other courts the "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination...." *United States v. Fausto,* 484 U.S. 439, 453, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988).

We note that if the assistant United States attorney were not covered by the statutory term "whoever," then the statute would not prohibit her even from bribing a witness with money in exchange for favorable testimony, which the government concedes the statute prohibits. *See* Aplees. Brief at 8; *see also United States v. Gorman,* 807 F.2d 1299, 1304–06 (6th Cir.1986) (affirming conviction of assistant United States attorney for taking illegal gratuity under parallel subsection), *cert. denied,* 484 U.S. 815, 108 S.Ct. 68, 98 L.Ed.2d 32 (1987). We conclude § 201(c)(2)

applies to federal prosecutors who make promises for or because of testimony on behalf of the government.

The assistant United States attorney made at least three promises to Napoleon Douglas. Because it is not clear that the government promised to move for a downward adjustment in return for his testimony, we rely for our analysis only on the three promises specifically made in the plea agreement: (1) the promise not to prosecute Mr. Douglas for certain offenses, (2) the promise to inform Mississippi authorities of his cooperation, and (3) the promise to inform the district court of his cooperation. These promises were made "for" his testimony: Mr. Douglas promised to testify "in consideration of" the three promises. *See* I R. doc 109, at 2–3 (Plea Agreement). The statute's "for or because of" language does not require a quid pro quo relation between the testimony and the promises, but merely requires that the promises be motivated by the testimony, even though the testimony might have been given without the promises. *See United States v. Johnson,* 621 F.2d 1073, 1076 (10th Cir.1980) (construing parallel subsection); *Evans,* 572 F.2d at 479–82; *United States v. Alessio,* 528 F.2d 1079, 1082 (9th Cir.) (same), *cert. denied,* 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976); *Brewster,* 506 F.2d at 71–72 (same). Here, however, the record indicates the testimony and the promises mutually induced one another, a relation stronger than the "for or because of" required by § 201(c)(2). *See United States v. Sun–Diamond Growers,* 138 F.3d 961, 966 (D.C.Cir. 1998) (construing parallel language in § 201(c)(1)(A)).

It remains only to determine whether the promises fall within the scope of the statutory term "anything of value." Because the term is not specifically defined in the statute, we assume the ordinary meaning of the words expresses the legislative purpose, and we interpret them according to their everyday meaning. *See Russello v. United States,* 464 U.S. 16, 21, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); *United States v. Pommerening,* 500 F.2d 92, 97 (10th Cir.), *cert. denied,* 419 U.S. 1088, 95 S.Ct. 678, 42 L.Ed.2d 680 (1974). "Value" embodies notions of worth, utility,

and importance generally. Congress could have, but did not limit or modify the word in any way. Accordingly, courts have recognized that "anything of value" under § 201 must be broadly construed to carry out its congressional purpose. *See, e.g., United States v. Williams,* 705 F.2d 603, 622–23 (2d Cir.) (noting that the phrase "has consistently been given a broad meaning"), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983). Our sister circuits have interpreted the phrase synonymously with "thing of value," and have noted that the pervasive use of the term in criminal statutes of both the states and the federal government has made it a term of art, covering intangible as well as tangible things. *See United States v. Nilsen,* 967 F.2d 539, 542–43 (11th Cir.1992) (construing 18 U.S.C. § 876), *cert. denied,* 507 U.S. 1034, 113 S.Ct. 1856, 123 L.Ed.2d 478 (1993); *United States v. Schwartz,* 785 F.2d 673, 679–81 (9th Cir.) (construing 18 U.S.C. § 1954), *cert. denied,* 479 U.S. 890, 107 S.Ct. 290, 93 L.Ed.2d 264 (1986); *United States v. Girard,* 601 F.2d 69, 71 (2d Cir.) (construing 18 U.S.C. § 641), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979).

The government argues that cases involving § 201(c) have all involved monetary payments. However, courts have uniformly rejected arguments that "anything of value" should be restricted to things of monetary, commercial, objective, actual, or tangible value. *See Schwartz,* 785 F.2d at 679–81; *United States v. Marmolejo,* 89 F.3d 1185, 1191 (5th Cir.1996) (construing 18 U.S.C. § 666), *aff'd sub nom. Salinas v. United States,* —— U.S. ——, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), and *cert. denied,* —— U.S. ——, 118 S.Ct. 599, 139 L.Ed.2d 487 (1997); *Nilsen,* 967 F.2d at 542–43 ("This broad interpretation is based upon a recognition that monetary worth is not the sole measure of value."); *Williams,* 705 F.2d at 622–23 (holding "anything of value" under § 201 is not limited to what objectively has actual value); *Girard,* 601 F.2d at 71.

Value has been accorded a broader, more common interpretation. *See Schwartz,* 785 F.2d at 679. We agree with those circuits which have held that the test of value is whether the recipient subjectively attaches value to the thing received. *See United*

*States v. Picquet,* 963 F.2d 54, 55 (5th Cir.) (construing 18 U.S.C. § 1029), *cert. denied,* 506 U.S. 902, 113 S.Ct. 290, 121 L.Ed.2d 215 (1992); *Gorman,* 807 F.2d at 1304–05; *Schwartz,* 785 F.2d at 680; *Williams,* 705 F.2d at 623 (holding that proper construction of § 201 focuses on whether recipient subjectively attached value to the thing received). *But cf. United States v. Sheker,* 618 F.2d 607, 609 (9th Cir.1980) (declining to adopt the view, under 18 U.S.C. § 912, that anything of value includes anything that has subjective value to the defendant, and instead requiring that the value be recognized or appreciated by others).

Courts construing the phrase have held a variety of intangibles to be things of value, including information regarding the whereabouts of a witness, information contained in DEA reports, assistance in arranging a merger, a witness's testimony, conjugal visits, amusement, the promise to reinstate an employee, and the promise not to run in a primary election. *See Sheker,* 618 F.2d at 609; *Girard,* 601 F.2d at 70–71; *Schwartz,* 785 F.2d at 679; *United States v. Zouras,* 497 F.2d 1115, 1121 (7th Cir.1974) (construing 18 U.S.C. § 876); *Marmolejo,* 89 F.3d at 1191; *Giomi v. Chase,* 47 N.M. 22, 132 P.2d 715, 716–17 (1942) (construing "thing of value" in state gambling statute); *People ex rel. Dickinson v. Van De Carr,* 87 A.D. 386, 84 N.Y.S. 461, 463–64 (N.Y.App.Div.1903) (construing "thing of value" in state bribery statute); *People v. Hochberg,* 62 A.D.2d 239, 404 N.Y.S.2d 161, 167 (N.Y.App.Div.1978) (same).

Although this precedent alone would require a conclusion that the promises made to Mr. Douglas are of value, four further considerations confirm the matter. First, much of the precedent cited construes the phrase "thing of value"; and the use in § 201 of "anything of value" indicates an even broader scope of coverage.

Second, much of the precedent construes statutory language in which the term appears at the end of a series of enumerated specifics, such as "any fee, kickback, commission, gift, loan, money, or thing of value." *Schwartz,* 785 F.2d at 679 (construing 18 U.S.C. § 1954, and noting that legislative history indicated the enumeration was one of

illustration, not limitation); *see Marmolejo,* 89 F.3d at 1191 (construing "anything of value of $5,000 or more"); *Nilsen,* 967 F.2d at 542 (construing "any money or other thing of value"); *Picquet,* 963 F.2d at 55; *Girard,* 601 F.2d at 70–71. That these courts have broadly construed the phrase to include intangibles in spite of the interpretive canon ejusdem generis indicates the strength of the term's plain meaning. In contrast to these cases and statutes, "anything of value" in § 201(c)(2) stands alone, unlimited by any enumeration.

Third, the purpose of the statute confirms Congress's broad language. One obvious purpose of the blanket prohibition in § 201 is to keep testimony free of all influence so that its truthfulness is protected. *See United States v. Biaggi,* 853 F.2d 89, 101 (2d Cir. 1988), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989); *Evans,* 572 F.2d at 480. The promise of intangible benefits imports as great a threat to a witness's truthfulness as a cash payment. *See United States v. Cervantes–Pacheco,* 826 F.2d 310, 315 (5th Cir.1987) ("It is difficult to imagine a greater motivation to lie than the inducement of a reduced sentence ...."), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988); *Schwartz,* 785 F.2d at 680 ("A violation of trust which is influenced by the offer of an intangible service is no less damaging ... than if the influence was in the form of a cash kickback."); *United States v. Meinster,* 619 F.2d 1041, 1045 (4th Cir.1980) ("We think it obvious that promises of immunity or leniency premised on cooperation in a particular case may provide a strong inducement to falsify in that case."); *see also United States v. Kimble,* 719 F.2d 1253, 1255–57 (5th Cir. 1983) (stating witness "admitted lying in over thirty different statements motivated by his sense of self-preservation" under plea arrangement requiring his testimony in return for lenient sentence), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984).

Fourth, § 201(c)(1) opens by providing "otherwise than as provided by law for the proper discharge of official duty." In contrast, § 201(c)(2) includes no such exemption for official acts authorized by law. Because Congress specifically exempted public duties from one subsection but did not exempt them from the subsection at issue in this case, we should interpret the plain language of the statute to cover promises of leniency by prosecutors.

We find no basis in law, policy, or common sense to judicially limit "anything of value" to things reducible to monetary or tangible value. Justice Holmes's words are appropriate: "[T]here is no canon against using common sense in construing laws as saying what they obviously mean." *Roschen v. Ward,* 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722 (1929).

In this light we apply the statutory phrase "anything of value" to the promises made to Mr. Douglas. The obvious purpose of the government's promised actions was to reduce his jail time, and it is difficult to imagine anything more valuable than personal physical freedom. *See Cervantes–Pacheco,* 826 F.2d at 315. Although the information promised by the government would certainly not guarantee Mr. Douglas's release, it was an invaluable step toward that end. The Ninth Circuit, in holding that information can be a thing of value, indicated by example the broad rationale of its holding: "For instance, state secrets might trade hands without cash consideration. Information obtained for political advantage might have value apart from its worth in dollars." *Schwartz,* 785 F.2d at 679 (quoting *Sheker,* 618 F.2d at 609); *see also United States v. Fowler,* 932 F.2d 306, 309–10 (4th Cir.1991) (joining Second and Sixth Circuits in holding information can be a thing of value under 18 U.S.C. § 641). *But see United States v. Tobias,* 836 F.2d 449, 451 (9th Cir.), *cert. denied,* 485 U.S. 991, 108 S.Ct. 1299, 99 L.Ed.2d 509 (1988). The information and intervention promised by the government for Mr. Douglas's legal advantage was of great value. *See, e.g., Sheker,* 618 F.2d at 609. In the case of the promise not to prosecute, the value was even greater: besides guaranteed physical freedom he was guaranteed freedom from the burden of defending himself and from the stigma of prosecution and conviction as well.

Our basis for determining these promises were of value is that the record indicates Mr. Douglas subjectively valued them. They were all he bargained for in return for his testimony and guilty plea. *See Nilsen,* 967 F.2d at 543 ("[T]he conduct and expectations

of a defendant can establish whether an intangible objective is a 'thing of value.' "). In addition, he testified that he wanted the government's assistance to help "everything work out for [him]." IV R. 206. In these circumstances the promises made to him fall well within the statutory term "anything of value." Having fulfilled every statutory element, we conclude the government's conduct was covered by the plain language and meaning of § 201(c)(2).

### B. The Structure of § 201

Our construction of the particular statutory language at issue is fortified by the language and structure of the statute as a whole. *See K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988); *Russello,* 464 U.S. at 22–26, 104 S.Ct. 296. Section 201 addresses corruption of public officials and witnesses, and its provisions have been divided generally into bribery prohibitions and gratuity prohibitions. *See, e.g., Johnson,* 621 F.2d at 1076 (quoting *United States v. Strand,* 574 F.2d 993, 995 (9th Cir.1978)). The bribery prohibitions, collected under § 201(b), are distinguished by their statutory requirements of corruptness on the part of the giver and intent to influence the receiver's action. The gratuity prohibitions collected under § 201(c), on the other hand, contain no requirements of corruption and intent to influence the receiver, and Congress attached concomitantly lesser penalties to their violation. *See United States v. Irwin,* 354 F.2d 192, 197 (2d Cir.1965) (construing current statutory language under prior subsection),[3] *cert. denied,* 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966). The gratuity prohibitions have been held to be lesser included offenses of the bribery provisions. *See, e.g., Brewster,* 506 F.2d at 67–76.

The statute at issue in this case, § 201(c)(2), is a gratuity prohibition, and like every other gratuity provision in § 201(c)(2), it contains no requirements of corruptness or intent to influence. *See Johnson,* 621 F.2d at

1076; *Brewster,* 506 F.2d at 71–72; *Irwin,* 354 F.2d at 197; *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non–Marine Ass'n,* 865 F.Supp. 1516, 1523 (S.D.Fla.1994), *aff'd in part, rev'd in part, and remanded,* 117 F.3d 1328 (11th Cir. 1997).

In contrast, a separate bribery provision under § 201(b), dealing with bribery of witnesses, does require heightened intent. Section 201(b)(3) provides that whoever "corruptly gives, offers, or promises anything of value to any person ... with intent to influence the testimony under oath or affirmation of such ... person as a witness" shall be fined or imprisoned. Congress thus deliberately included the corruptness and intent-to-influence elements in § 201(b)(3) and excluded them from § 201(c)(2). " '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Brown v. Gardner,* 513 U.S. 115, 120, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) (quoting *Russello,* 464 U.S. at 23, 104 S.Ct. 296). Moreover, the predecessor statute to § 201(c)(2) did require an agreement that the testimony would be influenced by the thing of value. *See* 18 U.S.C. § 209 (1952). Congress deliberately deleted that language, and it is not our place to reinsert it.

Section 201(d) further illumines the plain meaning of § 201(c)(2). This subsection provides:

Paragraphs (3) and (4) of subsection (b) and paragraphs (2) and (3) of subsection (c) shall not be construed to prohibit the payment or receipt of witness fees provided by law, or the payment, by the party upon whose behalf a witness is called and receipt by a witness, of the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing, or proceeding, or in the case of expert witnesses, a rea-

---

**3.** Section 201, with its present statutory language, was enacted in 1962. In 1986 Congress renumbered § 201 into its present form. *See* Criminal Law & Procedure Technical Amendments Act of 1986, Pub.L. 99–646, § 46(h), 100 Stat. 3592, 3603 (1986). The pre–1986 statute,

which *Irwin* interpreted, contained the same distinctions between bribery and gratuity provisions. Section 201(c)(2), which was designated § 201(h) before 1986, has not been altered since its enactment in 1962.

sonable fee for time spent in the preparation of such opinion, and in appearing and testifying.

18 U.S.C. § 201(d). The existence of § 201(d) as a specific exception to § 201(c)(2) indicates that § 201(c)(2) would otherwise prohibit travel and other witness fees, which are given to witnesses because of their testimony.

We find no clearly expressed legislative intention contradicting the statute's language. The legislative history confirms Congress's purpose that giving or receiving anything of value by "witnesses 'for' or 'because of' ... testimony ... should also be prohibited." H.R.Rep. No. 87–748, at 16 (1961). The committee report also indicates Congress's policy: "The conduct which is forbidden has the appearance of evil and the capacity of serving as a cover for evil." *Id.* at 19, 104 S.Ct. 296. The purpose and policy of the statute confirm its plain language and structure. We conclude § 201(c)(2) prohibited the government's promises to Mr. Douglas of leniency and intervention on his behalf in return for his testimony. *See Dixson v. United States,* 465 U.S. 482, 496, 104 S.Ct. 1172, 79 L.Ed.2d 458 (1984) ("Congress' longstanding commitment to a broadly drafted federal bribery statute, its expressed desire to continue that tradition with the 1962 revisions, its affirmative adoption of the language at issue in this case, and the House Report[ ] ... combine to persuade us that Congress never intended § 201(a)[ ] ... to be given the cramped reading proposed by petitioners."). The Supreme Court's more recent words are instructive as well: "No rule of construction ... requires that a penal statute be strained and distorted in order to exclude conduct clearly intended to be within its scope...." *See Salinas v. United States,* — U.S. —, 118 S.Ct. 469, 475, 139 L.Ed.2d 352 (1997) (citing *United States v. Raynor,* 302 U.S. 540, 552, 58 S.Ct. 353, 82 L.Ed. 413 (1938)).[4]

## II. The Law Enforcement Justification

The government asserts, without argument or authority, that agreements for testimony

between the government and a witness are not contemplated by this statute. Its position is that its agreement in return for testimony was justified and legitimate, and that Congress could not have intended § 201(c)(2) to hamper the punishment of crime by bringing within its sweep this government practice. Even assuming such a practice, our answer is that the matter was one of policy for Congress to decide. *See Nardone,* 302 U.S. at 383, 58 S.Ct. 275. In *Nardone* the Court rejected an argument that the government should be exempt from the federal wiretap statute, suggesting, "Congress may have thought it less important that some offenders should go unwhipped of justice than that officers should resort to methods deemed inconsistent with ethical standards and destructive of personal liberty." *Id.* We likewise discern what § 201(c)(2) contemplates from its language, and its language makes no exception for the government's conduct. Although the government's apparent practice of giving inducements for testimony, as opposed to other forms of cooperation, and the judiciary's seeming approval of such practice give us pause, they do not alter the words of a clear statute. *See Brogan v. United States,* — U.S. —, 118 S.Ct. 805, 811, 139 L.Ed.2d 830 (1998). "The execution of the federal laws under our Constitution is confided primarily to the Executive Branch of the Government, subject to applicable constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations." *Hampton v. United States,* 425 U.S. 484, 490, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) (quoting *United States v. Russell,* 411 U.S. 423, 435, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973)).

To answer the government's vague argument that some overriding policy should prevent application of this statute to the government's conduct, we will raise sua sponte the justification of law enforcement authority. "Criminal prohibitions do not generally apply to reasonable enforcement actions by officers of the law." *Brogan,* 118 S.Ct. at 811. If the justification applies, conduct which violates

4. The argument that § 201(c)(2) applies to government inducements for testimony appears first to have been made (excepting several older cases which we address later) in an article by a former

government prosecutor. *See* J. Richard Johnston, *Paying the Witness: Why Is It OK for the Prosecution, but Not the Defense?,* 12 WTR Crim. Just. 21 (1997).

the terms of a criminal statute is nevertheless not forbidden. The justification can be generally described as follows: a peace officer, prison guard, or private citizen authorized to act as a peace officer may, to the extent necessary to make an arrest, prevent an escape, or prevent the commission of a crime, violate a criminal statute if the conduct which constitutes the violation is reasonable in relation to the gravity of the evil threatened and the importance of the interest to be furthered. *See* Paul H. Robinson, *Criminal Law Defenses* § 142(a) (1984). The government's conduct does not fall within this justification for at least two reasons: it was not undertaken by a peace officer or one acting in that capacity, and it was not required by an exigent need to make an arrest or prevent an escape or other crime.

The Supreme Court's more general statement of the rule that "[c]riminal prohibitions do not generally apply to reasonable enforcement actions by officers of the law," embraces field enforcement activity. *Brogan*, 118 S.Ct. at 811. The Court has held, for example, that the government's limited undercover participation in an unlawful drug operation is "a recognized and permissible means of investigation." *United States v. Russell*, 411 U.S. 423, 432, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *see Lewis v. United States*, 385 U.S. 206, 208–09, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966). *Brogan* itself states that 18 U.S.C. § 1001 "does not make it a crime for an undercover narcotics agent to make a false statement to a drug peddler." *Brogan*, 118 S.Ct. at 811 (internal quotes and alterations omitted); *see United States v. Monaco*, 700 F.2d 577, 580–81 (10th Cir.1983) ("To obtain evidence of certain crimes undercover agents frequently must participate in illegal activities."); *United States v. Szycher*, 585 F.2d 443, 449 (10th Cir.1978) ("Government officers can, of course, employ appropriate artifice and deception to ferret out illegal activities."); *cf. United States v. Duggan*, 743 F.2d 59, 83–84 (2d Cir.1984) (holding defense of public authority requires government agent to have actual authority to authorize statutory violation); *United States v. Anderson*, 872 F.2d 1508, 1516 (11th Cir.) (holding because CIA agents have no authority to violate federal statutes, defense fails),

*cert. denied*, 493 U.S. 1004, 110 S.Ct. 566, 107 L.Ed.2d 560 (1989); Fed.R.Crim.P. 12.3 (regulating presentation of law enforcement defense).

The conduct of police, investigators, and law enforcement agents is regularly evaluated against the standard of what is legitimate and reasonably necessary to enforce the law. *See, e.g., United States v. Mosley*, 965 F.2d 906, 908–15 (10th Cir.1992); *United States v. Warren*, 747 F.2d 1339, 1341–44 & nn. 4–10 (10th Cir.1984) (collecting cases); *Monaco*, 700 F.2d at 580–81; *United States v. Biswell*, 700 F.2d 1310, 1314 (10th Cir.1983); *Szycher*, 585 F.2d at 449; *see also United States v. Asencio*, 873 F.2d 639, 640–41 (2d Cir.1989). But we have found no case in which prosecutors, in their role as lawyers representing the government after the initiation of criminal proceedings, have been granted a justification to violate generally applicable laws. *See United States v. Ryans*, 903 F.2d 731, 739–40 (10th Cir.) (holding that disciplinary rule applies to prosecutors upon commencement of criminal proceedings), *cert. denied*, 498 U.S. 855, 111 S.Ct. 152, 112 L.Ed.2d 118 (1990).

The law enforcement justification exists to allow field officers a practically necessary means to detect and prevent crime, and to apprehend suspects. It is justified by the difficulties inherent in detecting certain types of crime. *See Russell*, 411 U.S. at 432, 93 S.Ct. 1637 (narcotics); *United States v. Kelly*, 707 F.2d 1460, 1468 (D.C.Cir.) (public corruption), *cert. denied*, 464 U.S. 908, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983); *Monaco*, 700 F.2d at 580–81 (prostitution). The government's violation of § 201(c)(2), however, is entirely unrelated to detecting crime. Once the exigencies of field enforcement are satisfied, we can find no policy by which prosecutors may be excused from statutes regulating testimony presented to the federal courts. Although there are difficulties inherent in proving certain types of crimes, violating § 201(c)(2) is not necessary to overcome those difficulties: compulsory process is lawful and available, and avoids the taint on truthfulness which attends unlawful witness gratuities. The law enforcement justification has never altered the playing field on which crimes are proved in court. We decline to

expand the meaning of "enforcement action" beyond its historical scope of detection, apprehension, and prevention of crime.

Because the government's statutory violation occurred not in a field investigation but in the context of testimony which was to be presented to the court, we further hold its action was not "reasonable." *Brogan*, 118 S.Ct. at 811. The chasm between the government's present conduct and reasonable law enforcement actions can be illustrated by analogy to the FBI's Abscam operation, under which operatives and undercover agents offered bribes to public officials and arrested those who accepted the bribes. *See Kelly*, 707 F.2d at 1461–63. Although Abscam created controversy and dissent in the courts, it was held a legitimate means of detecting public corruption. *See, e.g., id.* at 1469–71. The government's present inducement for testimony goes much further. Reasonable law enforcement actions stop with detecting crime and observing enough to prove it. The government's statutory violation unreasonably exceeds this purpose, and is the more egregious because the intended product of the violation is testimony presented in court. We conclude the government's violation of § 201(c)(2) was neither "reasonable" nor an "enforcement action." *Brogan*, 118 S.Ct. at 811. Consequently it falls outside the scope of legitimate investigatory practices and is not justified by law enforcement authority.

Cases involving the application of ethical rules to federal prosecutors fortify our conclusion. The Department of Justice attempted, first through a policy statement known as the Thornburgh Memorandum, then through a federal regulation, 28 C.F.R. pt. 77 (1997), to exempt its litigators from state ethical rules prohibiting ex parte communication with represented parties. The federal courts have unanimously rejected the notion that federal prosecutors are exempt from these ethical rules.[5] *See, e.g., United States ex rel. O'Keefe v. McDonnell Douglas Corp.*, 132

F.3d 1252, 1257 (8th Cir.1998); *United States v. Lopez*, 4 F.3d 1455, 1458–63 (9th Cir.1993). In doing so, courts have rejected arguments that the rule "was not intended to apply to prosecutors pursuing investigations," or that their contact "was authorized by law." *Lopez*, 4 F.3d at 1458; *see also Matter of Doe*, 801 F.Supp. 478, 484–87 (D.N.M.1992). If federal prosecutors are bound by an ethical rule governing ex parte contact in the course of a prosecution, we think it even more clear that they are bound by a federal statute regulating the evidence presented in federal court. The Supreme Court has reiterated, in another context, the prevailing rule that "a federal official may not with impunity ignore the limitations which the controlling law has placed on his powers." *Butz v. Economou*, 438 U.S. 478, 489, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

### III. Section 201(c)(2) in Relation to Other Statutes

The government argues that several provisions of law authorized it to make its agreement with Mr. Douglas. The government apparently refers to an unwritten agreement with Mr. Douglas to make a sentence reduction recommendation. *See* Aplees. Brief at 7, 9. Although any such agreement is not before us because it is not clear from the record that it was made, we will construe the government's argument as one that it had statutory authorization for the three written promises it did make to Mr. Douglas for his testimony.

The federal criminal sentencing statute, 18 U.S.C. § 3553(e), provides, "Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense." In addition, 28 U.S.C. § 994(n) in-

---

**5.** A subcommittee of Congress also expressed its disapproval of the Department of Justice's position:

> We disagree with the Attorney General's attempts to exempt departmental attorneys from compliance with ethical requirements adopted by the State bars to which they belong and in the rules of the Federal courts before which they

appear. While recognizing that it is ultimately the courts who finally decide disputes over such authority, we nevertheless urge reconsideration and withdrawal of the Attorney General's June 8, 1989 memorandum, "Communication with Persons Represented by Counsel."

H.R.Rep. No. 101–986, at 32 (1990).

structs the United States Sentencing Commission to ensure that guidelines reflect "the general appropriateness of imposing a lower sentence than would otherwise be imposed, including a sentence that is lower than that established by statute as a minimum sentence, to take into account a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense." Accordingly, USSG § 5K1.1 provides that the government may move for a downward departure from the guidelines if it determines the defendant has "provided substantial assistance in the investigation or prosecution of another person who has committed an offense...." USSG § 5K1.1. "The appropriate reduction shall be determined by the court for reasons stated that may include ... the truthfulness, completeness, and reliability of any information or testimony provided by the defendant." *Id.* at § 5K1.1(a)(2). The government also cites Fed.R.Crim.P. 35(b), which says, "The court, on motion of the Government made within one year after the imposition of the sentence, may reduce a sentence to reflect a defendant's subsequent, substantial assistance in the investigation or prosecution of another person who has committed an offense...."

Each of these provisions of law authorizes only that substantial assistance can be rewarded after it is rendered; none authorizes the government to make a deal for testimony before it is given, as the government did with Mr. Douglas. Consequently the statutes cannot justify the government's promises in this case.

However § 201(c)(2) prohibits even the rewarding of testimony after it is given: it prohibits anything of value to be given, offered or promised "because of" testimony "given." 18 U.S.C. § 201(c)(2). The sentencing provisions may thus appear to conflict by authorizing something of value (a motion for and grant of sentence reduction) to be given "because of" testimony rendered. We believe the statutes can be read together in this way: in light of § 201(c)(2), "substantial assistance" does not include testimony. Congress enacted the sentencing provisions against the backdrop of its general prohibition against giving anything of value for or because of testimony. *See generally* 2B Nor-

man J. Singer, *Sutherland Statutory Construction* § 53.01 (5th ed.1992). Against this background, § 994 authorizes the Sentencing Commission to reward all forms of substantial assistance other than testimony.

Our reading of the statutes will not impair the substantial assistance provisions, because a defendant can substantially assist an investigation or prosecution in myriad ways other than by testifying. Nor will our holding drastically alter the government's present practices. The government may still make deals with accomplices for their assistance other than testimony, and it may still put accomplices on the stand; it simply may not attach any promise, offer, or gift to their testimony. Because the operation of the sentencing statutes is not positively repugnant to § 201(c)(2), we must give effect to both. *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). The question whether USSG § 5K1.1(a)(2) exceeds statutory authority or conflicts with § 201(c)(2) by making testimony, as opposed to other forms of cooperation, a basis for a finding of substantial assistance is not directly before us, and we do not decide it.

The government's reliance on the substantial assistance sentencing statutes is, in essence, an argument that they impliedly amend or repeal the plain prohibition of § 201(c)(2). Courts generally and quite consistently disfavor implied repeals and amendments. *See, e.g., United States v. Estate of Romani*, —— U.S. ——, 118 S.Ct. 1478, 1486, 140 L.Ed.2d 710 (1998) (declining to consider implied amendment or repeal, and instead harmonizing statutes); 1A Norman J. Singer, *Sutherland Statutory Construction* § 22.13 (5th ed. 1992) ("Amendments by implication, like repeals by implication, are not favored and will not be upheld in doubtful cases ...."); *id.* at § 23.09 ("Courts are reluctant to find repeal by implication even when the later statute is not entirely harmonious with the earlier one. If two statutes conflict somewhat, the court must, if possible, read them so as to give effect to both...."). Courts will generally not find an implied repeal or amendment unless either the text or legislative history indicates Congress's in-

tent to obviate the legal power of the earlier statute. *See id.* at § 23.10. We find no glimmer of such an indication in the sentencing statutes or their legislative history.

## IV. Precedent

Although neither party cited any case in which a criminal defendant argued the government violated § 201(c)(2) by offering leniency or other inducements to a witness, we have been able to find three such reported cases. We find each unpersuasive.

In *United States v. Isaacs,* 347 F.Supp. 763 (N.D.Ill.1972), one of the defendants in a prosecution for conspiracy, bribery, and other offenses argued that the government violated § 201(h), the identical predecessor of § 201(c)(2), by exercising influence on state officials to procure something of value for a witness. The United States Attorney, in cooperation with the Department of Justice, allegedly went to California and met with state officials to persuade them to grant the witness a license to become a director of the Hollywood Park Turf Club without a public hearing and in spite of the witness's implication in the bribery. *See id.* at 767. It was necessary to avoid a public hearing on the license so the witness would not be subject to cross-examination on her involvement in the bribery. *See id.*

The defendant, relying only on newspaper reports, argued the government had violated § 201(h) by giving something of value to a witness for her testimony, and requested an evidentiary hearing to develop facts on the matter. In making its ruling, the court mischaracterized § 201(h), stating the defendant's argument was based on an inference that the award of the license to the witness was "a bribe intended to influence her testimony...." *Id.* at 767. The statute is abundantly clear that it proscribes gratuities regardless of intent to influence testimony. The court then denied the defendant's motion on two grounds. First, it held the conjectural allegations based on newspaper reports were insufficient to warrant an evidentiary hearing. *See id.* Second, it held that *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) indicated that suppression was not an appropriate remedy when the government promises leniency to a wit-

ness in return for her testimony. *See Isaacs,* 347 F.Supp. at 767.

*Giglio* held the government must disclose a promise of leniency made to a key witness in return for his testimony. *See Giglio,* 405 U.S. at 153–54, 92 S.Ct. 763. Section 201(h) was not implicated in *Giglio;* the defendant there argued only that the promise was material exculpatory evidence going to the credibility and reliability of the key witness, and that he was entitled to a new trial to present the evidence to the jury. The Supreme Court agreed, holding that due process was violated when the jury was erroneously told no promises of leniency were made to the witness, because evidence of the promise was "relevant to his credibility and the jury was entitled to know of it." *Id.* at 155, 92 S.Ct. 763. The *Isaacs* court took this statement to preclude application of § 201(h).

We believe *Giglio's* holding—that *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) applies to impeachment evidence—is not dispositive of the statutory question before us, a question not presented to the Court in *Giglio.* It is quite clear that due process as interpreted in *Brady* and *Giglio,* as well as federal legislation, *see* Jencks Act, 18 U.S.C. § 3500, require a large class of materials to be turned over to the defense in a criminal case. Evidence of the government's valuable promises to a witness falls within this class. But this does not prohibit Congress from also criminalizing certain conduct within the class. For example, the government in a criminal case must disclose known perjury to the defense. *See United States v. Agurs,* 427 U.S. 97, 103–04, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Yet the occurrence of perjury remains a crime. *See* 18 U.S.C. §§ 1621, 1623. Likewise the criminality of offering anything of value for testimony is not inconsistent with *Giglio's* rule that the offer be disclosed. An unambiguous statute is before us, and within constitutional boundaries we have no authority to refuse to apply it. Consequently we must reject *Isaac's* inference from *Giglio* that § 201(c)(2) does not apply in this situation.

Section 201(h) was also raised by the defendant in *United States v. Barrett,* 505 F.2d 1091, 1100–02 (7th Cir.1974), *cert. denied,* 421

U.S. 964, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975), in which the government entered into a plea agreement similar to its agreement with Mr. Douglas. In *Barrett,* the primary witness against the defendant pled guilty and agreed to testify in return for the government's recommendation of an extraordinarily lenient sentence, transactional immunity, and civil tax immunity. The witness's testimony was that he paid large bribes to various public officials; in return for this testimony, he was exempted from paying tax and penalties on the money constituting the bribes. The defendant moved to suppress on the ground that this arrangement violated § 201(h). The district court denied the motion but allowed the government's bargain to be used to impeach the witness's credibility. *See id.*

The Seventh Circuit approved this disposition and in a footnote repeated *Isaacs's* inference from *Giglio. See id.* n. 9. It went on to state that the premise of the defendant's § 201(h) argument was that the government had no authority to grant civil tax immunity in return for testimony. The defendant conceded the government did not violate § 201(h) by granting criminal immunity, because the United States Code authorizes the government to grant such immunity. *See* 18 U.S.C. § 6002. Following this reasoning, the court found a provision of the tax code authorizing the government to settle any tax case, 26 U.S.C. § 7122, and held that because Congress authorized the government to settle tax liability, it could settle tax liability in return for testimony. *See Barrett,* 505 F.2d at 1101–02.

We believe this conclusion is incorrect because both the court and the parties reasoned from a faulty premise. Section 201(h) did not prohibit the government from giving *unauthorized* things of value for testimony; it proscribed giving *anything* of value for testimony. To read the section as prohibiting only the giving of unauthorized things (besides ignoring its plain language) is to read it right out of the code. It is a truism that the government may not do unauthorized things. And it is § 201(h) that makes

gifts, offers, and promises unauthorized in certain circumstances. If the section is to have any meaning it must be read to prohibit giving otherwise authorized things "for" or "because of" testimony. Otherwise, under *Barrett's* reasoning, the government's authorization to expend money means the government may pay money to a witness for his testimony. We will not eviscerate the statute in this way. Section 201(c)(2) discriminates not on the basis of what things of value are authorized, but on whether the thing of value is given "for" or "because of" testimony.

Finally, the Sixth Circuit addressed an argument like Ms. Singleton's in *United States v. Blanton,* 700 F.2d 298, 310–11 (6th Cir.), *reheard in part,* 719 F.2d 815 (6th Cir.1983),[6] *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1592 (1984), in which the former governor of Tennessee, Leonard Blanton, was convicted on various charges of corruption. The primary witness against him received a liquor license through a corrupt arrangement with Mr. Blanton. In return for the witness's truthful testimony, the United States persuaded Tennessee's Alcoholic Beverage Commission not to revoke his liquor license. The witness wanted the government's persuasion because fraud in procuring a liquor license was ground for its revocation. *See id.*

Mr. Blanton argued the witness's testimony should have been suppressed because the government procured it in return for something of value, in violation of § 201(h). The court rejected his argument, holding the "purported 'thing of value'—a liquor license—was not offered by the government." *Id.* at 311. It supported this by stating that the government used only persuasion and exercised no coercive power. Further, it held the government did not "give" a thing of value because it merely preserved the status quo: the witness kept the license he previously had. *See id.*

Neither ground of the holding persuades us. It seems apparent to us that the issue was whether the government's persuasion,

---

**6.** Although the mandate of the panel opinion was vacated when the Sixth Circuit reheard the case en banc, the rehearing was limited to issues unrelated to § 201(h). The en banc opinion specifically adopted the panel's dispositions and reasoning on all other issues, including the § 201(h) matter. *See Blanton,* 719 F.2d at 817, 833.

which was offered and given, was a thing of value. The court's focus on the liquor license and on the state's control of it obscures this point: the government's intangible persuasion might have been enormously valuable to the witness, since he sought it and it was effective in the goal of retaining his license. We are likewise unpersuaded that preservation of the status quo cannot constitute a thing of value. The persuasion of the United States was brought to bear in return for testimony at a time when the witness's status quo (which happened to be ill-gotten gain) was about to change drastically for the worse. We find no principled basis in *Blanton* on which to hold the government's conduct in our case was not covered by the unambiguous prohibition of § 201(c)(2). "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).

We further disagree with the Eleventh Circuit to the extent it has held that § 201(c)(2) is violated only when the resultant testimony is false. *See Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non–Marine Ass'n*, 117 F.3d 1328, 1335 n. 2 (11th Cir.1997); *United States v. Moody*, 977 F.2d 1420, 1424–25 (11th Cir.1992), *cert. denied*, 507 U.S. 944, 113 S.Ct. 1348, 122 L.Ed.2d 730 (1993). It seems the court in *Golden Door* took out of context *Moody*'s statement that § 201(c)(2) "obviously proscribes a bribe for false testimony; persons of ordinary intelligence would come to no other conclusion." *Moody*, 977 F.2d at 1425. *Moody* upheld § 201(c)(2) against overbreadth and vagueness challenges by a defendant who had paid a witness to fabricate a story in court. The court held that as applied to these facts the statute was not vague or overbroad: no one of ordinary intelligence could contest that the statute clearly prohibited this conduct. *See id.* at 1424. *Moody* nowhere intimated the statute applied *only* to false testimony. In the context of the as-applied challenge, the court had no occasion to determine what other conduct the statute proscribed, and the defendant did not demonstrate any real or substantial unconstitu-

tional applications. *See Moody*, 977 F.2d at 1424–25.

Moreover, requiring false testimony under § 201(c)(2) would interpose elements not required even by the bribery provisions, which do not require the bribe recipient's action to be influenced in fact. *See United States v. Hernandez*, 731 F.2d 1147, 1149 (5th Cir. 1984); *Johnson*, 621 F.2d at 1076. "We ought not to open the door to an evasion of the statute by this device." *Oubre v. Entergy Operations, Inc.*, —— U.S. ——, 118 S.Ct. 838, 842, 139 L.Ed.2d 849 (1998). It is anomalous to require under a gratuity provision both that testimony actually be given, and that it be false, when the bribery provisions require neither. *See Hernandez*, 731 F.2d at 1149 ("The crime [of bribery] is consummated whether or not the offer is accepted by the offeree.").

We conclude that under § 201(c)(2) the promise need not be intended to affect, and need not actually affect, the testimony in any way. Promising something of value to secure truthful testimony is as much prohibited as buying perjured testimony. *See Shuttlesworth v. Housing Opportunities Made Equal*, 873 F.Supp. 1069, 1078 (S.D.Ohio 1994). In a similar gratuity provision prohibiting gifts, promises, or offers to a public official for or because of an official act, *Irwin* held, "It is not necessary for the Government to show that the gift caused or prompted or in any way affected the happening of the official act or had anything to do with its nature or extent or the manner or means by which it was performed." *Irwin*, 354 F.2d at 197. We believe there is no principled basis on which to judicially add elements to the statute when Congress has chosen not to include them. "[W]here the words of a law, treaty, or contract, have a plain and obvious meaning, all construction, in hostility with such meaning, is excluded. This is a maxim of law, and a dictate of common sense...." *Green v. Biddle*, 21 U.S. (8 Wheat.) 1, 89–90, 5 L.Ed. 547 (1823).

## V. Kansas Professional Rule 3.4(b)

Ms. Singleton argues the government violated Kansas Professional Rule 3.4(b) in presenting the testimony of Mr. Douglas. The

rule, adopted by the Supreme Court of Kansas, provides, "A lawyer shall not … offer an inducement to a witness that is prohibited by law." Kansas Rule of Professional Conduct 3.4(b) (1997). Commentary to the Model Rules, as adopted by the Supreme Court of Kansas, states, "The common law rule in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying. . . ." Kansas Rule of Professional Conduct 3.4(b) cmt. (1997). We have already established, in agreement with our sister circuits, that intangible value can be equivalent to financial value, and that the promise of leniency is an equal or greater incentive to lie than is cash. Moreover, because we have held that the government's promises ran afoul of 18 U.S.C. § 201(c)(2), and were thus prohibited by law, we must conclude the government violated Rule 3.4(b).

## VI.   Remedy

In the circumstances before us, the appropriate remedy for the testimony obtained in violation of § 201(c)(2) is suppression of its use in Ms. Singleton's trial.[7]   "[T]he principal reason behind the adoption of the exclusionary rule was the Government's 'failure to observe its own laws.'"   *United States v. Russell,* 411 U.S. 423, 430, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) (quoting *Mapp v. Ohio,* 367 U.S. 643, 659, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)). The exclusionary rule has been applied to constitutional, statutory, and procedural rule violations to deter unlawful conduct. *See United States v. Blue,* 384 U.S. 251, 255, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966). The Supreme Court itself has applied the rule to various statutory violations, *see Sabbath v. United States,* 391 U.S. 585, 586, 588–90, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); *Miller v. United States,* 357 U.S. 301, 313–14, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); *Nardone v. United States,* 308 U.S. 338, 339–41, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Nardone v. United States,* 302 U.S. 379, 380–84, 58 S.Ct. 275, 82 L.Ed. 314 (1937), and has held open this application while denying use of the rule for certain regulatory violations, *see United States v. Caceres,* 440 U.S. 741, 754–55 & n. 21, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). Likewise the courts of appeals have held suppression appropriate where federal statutes have been violated. *See, e.g., United States v. Marts,* 986 F.2d 1216, 1218–19 (8th Cir.1993); *United States v. Rivieccio,* 919 F.2d 812, 816 (2d Cir.1990), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991); *United States v. Chemaly,* 741 F.2d 1346, 1353–54 & n. 2 (11th Cir.1984), *reh'g en banc vacated and panel opinion reinstated,* 764 F.2d 747 (11th Cir.1985) (en banc); *United States v. Soto–Soto,* 598 F.2d 545, 550 (9th Cir.1979); *United States v. Genser,* 582 F.2d 292, 307–09 (3d Cir.1978). Although its application to statutory violations is not automatic, *see Weiss v. Commissioner,* 919 F.2d 115, 116 (9th Cir.1990), we believe the policies of the rule require its use in this context.

Suppression is a judicially fashioned rule whose primary purpose is to deter official misconduct. *See United States v. Peltier,* 422 U.S. 531, 542, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975); *United States v. Calandra,* 414 U.S. 338, 347–48, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). We must balance the good of preventing future unlawful conduct with the evil of disallowing relevant evidence of guilt in an individual case. *See United States v. Duchi,* 944 F.2d 391, 396 (8th Cir.1991).

We believe exclusion will effectively deter the unlawful conduct before us. Agreements to seek leniency or refrain from filing charges in return for testimony are entered into with the intention of presenting to a court the testimony so acquired. Excluding that tainted testimony removes the sole purpose of the unlawful conduct and leaves no incentive to violate § 201(c)(2).   *Cf. id.* Courts declining to apply the exclusionary rule for violation of statutes have done so on the ground that it is "inappropriate until such time as 'widespread and repeated violations'" of the statute exist, *United States v. Roberts,* 779 F.2d 565, 568 (9th Cir.) (quoting *United States v. Wolffs,* 594 F.2d 77, 85 (5th Cir.1979)), *cert. denied,* 479 U.S. 839, 107 S.Ct. 142 (1986), and they have specifically held the remedy available for that situation, *see United States v. Griley,* 814 F.2d 967, 976 (4th Cir.1987). This approach is appropriate because deterrence is a preventive function

---

**7.** The suppression remedy we apply rests wholly on the government's statutory violation, not on the prosecutor's violation of Kansas Professional Rule 3.4(b).

which cannot be served unless there is a significant likelihood of future violations to be deterred. *See Calandra,* 414 U.S. at 347–48, 94 S.Ct. 613. We have exactly that situation. "No practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises him a reduced sentence." *Cervantes–Pacheco,* 826 F.2d at 315. This ingrained practice of buying testimony indicates that suppression is necessary to compel respect for the statutory protections Congress has placed around testimony in federal courts. Exclusion is also necessary to remove the incentive to disregard the statute. *See Calandra,* 414 U.S. at 347, 94 S.Ct. 613 (quoting *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)). The benefits of deterrence outweigh the evil of excluding relevant evidence, and the balance falls heavily in favor of suppression.

A secondary policy protected by the exclusionary rule is "the imperative of judicial integrity." *Elkins,* 364 U.S. at 222, 80 S.Ct. 1437. Courts will not be made party to lawlessness by permitting unhindered use of the fruits of illegality. *See Terry v. Ohio,* 392 U.S. 1, 12–13, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Mapp,* 367 U.S. at 660, 81 S.Ct. 1684. Although this basis for the exclusionary rule exerts limited force, *see Stone v. Powell,* 428 U.S. 465, 485, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *see also* John Kaplan, *The Limits of the Exclusionary Rule,* 26 Stan. L.Rev. 1027, 1036 & n. 53 (1974); Henry P. Monaghan, *The Supreme Court 1974 Term—Foreword: Constitutional Common Law,* 89 Harv. L.Rev. 1, 5–6 & n. 33 (1975), we find it relevant because of the substance of the policy codified in § 201(c)(2).

The Second Circuit has written, regarding parallel provisions in § 201 prohibiting bribes and gratuities in the context of public officials,

"[T]here is no reason to infer that the policy and purpose behind the 'corrupt intent to influence' offenses [are] substantially different from [those] underlying the 'for or because of' offenses.... '[E]ven if corruption is not intended by either the donor or the donee, there is still a tendency in such a situation to provide conscious or unconscious preferential treatment of the donor by the donee....'"

*Biaggi,* 853 F.2d at 101 (second and third alterations in original) (quoting *United States v. Biaggi,* 674 F.Supp. 86, 89 (E.D.N.Y.1987) (quoting *United States v. Evans,* 572 F.2d 455, 480 (5th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 200 (1978))). We find this comparison of policy applicable between the witness bribery and gratuity prohibitions. Congress evidenced an intent in § 201(c)(2) to remove the temptation inherent in a witness's accepting value from a party for his testimony. *See Evans,* 572 F.2d at 480. That temptation, even if unconscious, is to color or falsify one's testimony in favor of the donor. The law already imposes on every witness the solemn and fundamental duty to testify truthfully, and accepting unlawful gratuities or inducements from a party compromises that solemn duty. When testimony tainted in this way is presented to the courts of the United States, judicial integrity is directly impugned in a way it is not by tangible evidence whose reliability is unaffected by an underlying illegality. And when the statutory policy of Congress is to protect courts and parties from that taint, suppression is particularly appropriate because it effectuates that purpose.

For this reason we are unpersuaded by cases holding suppression inappropriate for statutory violations on the ground that where Congress has established other penalties the courts should not create a judicial remedy. *See, e.g., United States v. Benevento,* 836 F.2d 60, 69–70 (2d Cir.1987), *cert. denied,* 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988); *United States v. Michaelian,* 803 F.2d 1042, 1049–50 (9th Cir.1986); *United States v. Kington,* 801 F.2d 733, 737–38 (5th Cir.1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 495 (1987); *see also United States v. Thompson,* 936 F.2d 1249, 1251–52 (11th Cir.1991), *cert. denied,* 502 U.S. 1075, 112 S.Ct. 975, 117 L.Ed.2d 139 (1992). Unlike all of these cases, the violation of § 201(c)(2) at issue in our case directly tainted the reliability of the evidence. To permit this unlawfully obtained evidence "to be made the basis of a conviction in the federal courts would stultify the policy which

Congress has enacted into law." *United States v. Mitchell,* 322 U.S. 65, 67, 64 S.Ct. 896, 88 L.Ed. 1140 (1944) (quoting *McNabb v. United States,* 318 U.S. 332, 345, 63 S.Ct. 608, 87 L.Ed. 819 (1943)).

We emphasize that the rule we apply today rests in no way on the Constitution; it is a creature solely of statute. The constitutional boundaries of testimony like that presented in this case have been amply delineated in *Hoffa v. United States,* 385 U.S. 293, 297–99, 310–12, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), *Brady,* 373 U.S. at 86–91, 83 S.Ct. 1194, *Giglio,* 405 U.S. at 155–56, 92 S.Ct. 763, *Cervantes–Pacheco,* 826 F.2d at 312–16, and the lines of cases they represent. Our holding today is unrelated to them.

### VII.   Sufficiency of the Evidence

Having concluded Ms. Singleton's motion to suppress should have been granted, we address her claim that the district court erred in denying her motion for judgment of acquittal as to both her conspiracy and money laundering convictions. We hold at the outset that the failure to suppress Mr. Douglas's testimony was not harmless error as to either the conspiracy or the money laundering convictions. The government relied on Mr. Douglas as its principal witness, and, considering the entire record, we are entirely unable to say that the admission of his testimony did not influence the verdict. *See Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

The remaining question is whether the record contains sufficient other evidence upon which a jury could find guilt beyond a reasonable doubt. If the evidence, excluding the testimony of Mr. Douglas, is legally insufficient to support her convictions, a new trial is prohibited by double jeopardy principles. *See United States v. McAleer,* 138 F.3d 852, 1998 WL 101804, at *4 (10th Cir.1998) (citing *Burks v. United States,* 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)). If, however, the record contains sufficient evidence to support a conviction without Mr. Douglas's testimony, then justice requires a new trial. *See United States v. Tateo,* 377

U.S. 463, 465, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964).

We review de novo the denial of a motion for judgment of acquittal. *See United States v. Lampley,* 127 F.3d 1231, 1242 (10th Cir. 1997), *cert. denied,* — U.S. ——, 118 S.Ct. 1098, 140 L.Ed.2d 153 (1998). Our standard is whether the evidence is sufficient to sustain a conviction. *See* Fed.R.Crim.P. 29(a). Excluding the testimony of Mr. Douglas and viewing the remaining evidence and all reasonable inferences from it in the light most favorable to the government, we conclude that a rational jury could have found Ms. Singleton guilty beyond a reasonable doubt of both the conspiracy and money laundering charges. *See United States v. Leos–Quijada,* 107 F.3d 786, 794 (10th Cir.1997); *see also United States v. Coleman,* 7 F.3d 1500, 1502–03 (10th Cir.1993); *United States v. Ruiz–Castro,* 92 F.3d 1519, 1531 (10th Cir.1996).

**REVERSED** and **REMANDED** for a new trial.

Before SEYMOUR, Chief Judge, PORFILIO, ANDERSON, TACHA, BALDOCK, BRORBY, EBEL, KELLY, BRISCOE, LUCERO and MURPHY, Circuit Judges.*

### ORDER

#### July 10, 1998.

Acting on its own motion pursuant to Fed. R. App. P. 35(a), the court orders that this appeal be reheard by the court en banc. Pending the determination by the en banc court, the opinion of the panel entered on July 1, 1998, is vacated in accordance with 10th Cir. R. 35.6. The appeal will be set for oral argument during the November session of court to be held in Denver, Colorado, on November 16-20, 1998.

On or before August 10, 1998, parties shall file simultaneous supplemental briefs not to exceed twenty pages. In addition to any other arguments pertinent to the case, they shall address whether any opinion reversing

---

* Judge Henry was not available and did not participate in this order.

the district court would have prospective or retrospective application.

The mandate is stayed.