USA v. Burke, et al.                CR-96-050-M    01/04/99

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


United States of America,
      Plaintiff

      v.                                  Criminal No. 96-50-1-6-M

John P. Burke, Stephen G. Burke,
Matthew McDonald, Patrick J.
McGonagle, Michael K. O'Halloran,
and Anthony M. Shea,
      Defendants


**O R D E R**


Defendants Stephen G. Burke, Matthew McDonald, Patrick J. McGonagle, Michael K. O'Halloran, and Anthony M. Shea (the "defendants") have filed a number of motions seeking, under Fed. R. Crim. P. 33, a new trial based on newly discovered evidence or, in the alternative, discovery relating to an alleged deal between the government and former codefendant John Burke regarding the latter's testimony at trial. For the reasons that follow, the defendants motions are denied.


**Background**

The defendants were charged under a fifteen count Second Superseding Indictment with numerous illegal activities including bank robbery, conspiracy to commit robbery, and carjacking. During trial, defendant John P. Burke entered into a plea agreement with the government under which he agreed to plead guilty to Count 4 of the Second Superseding Indictment (conspiracy to commit robbery) in exchange for the government's

dropping all remaining counts. The prosecution presented John Burke's plea agreement, to the court (and later to the jury), as a "naked" plea, that is, a straightforward plea to one count in exchange for dismissal of the remaining counts, without any further obligations on either side. John Burke's plea was accepted and accordingly, he was found guilty of Count 4. Sometime thereafter Burke also agreed to testify against his codefendants, pursuant to a grant of immunity extended by the government.

On December 22, 1997, the jury returned guilty verdicts against each defendant. Several months later, on July 1, 1998, the government moved, pursuant to Fed. R. Crim. P. 48(a), for leave to dismiss the one remaining count against John Burke, to which he previously had pled guilty.

On July 13, 1998, defendant Stephen Burke (John Burke's brother and co-defendant) filed a Second Motion for New Trial, based on newly discovered evidence. Defendants Shea and McGonagle filed similar motions and they and the remaining defendants moved to join some or all of their codefendants' similar motions. This order will resolve all outstanding motions for new trial as if constituting a single motion joined by all defendants.

While defendants' motions for new trial, based on, <u>inter alia</u>, John Burke's alleged deal, were pending, and following hearings, the government reconsidered its position and decided to withdraw its motion for leave to dismiss the remaining count

2

against John Burke.  The motion to withdraw was granted on August 27, 1998, and John Burke was subsequently sentenced on the count to which he pled guilty.

## Discussion

Fed. R. Crim. P. 33 provides that the court "may grant a new trial to [a] defendant if required in the interest of justice." In order to prevail on their motions for new trial based on newly discovered evidence, defendants must show that "the evidence was: (i) unknown or unavailable at the time of trial, (ii) despite due diligence, (iii) material, and (iv) likely to result in an acquittal upon retrial." United States v. Tibolt, 72 F.3d 965, 971 (1st Cir. 1995), cert. denied, 518 U.S. 1020 (1996).  The third and fourth requirements are less rigorous where, as defendants allege here, the newly discovered evidence was in the possession of, but not disclosed by the government.  Id.  In that case the test, as usually stated, is that "the nondisclosure justifies a new trial if it is 'material,' . . . [that is,] if there is 'a reasonable probability' that the evidence would have changed the result . . . . [A] 'reasonable probability' is 'a probability sufficient to undermine confidence in the outcome.'" United States v. Sepulveda, 15 F.3d 1216, 1220 (1st Cir. 1993)(quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).

Defendants argue that John Burke and the government had either an explicit or implicit deal, or at least some actual understanding, under the terms of which John Burke would testify

3

against his codefendants in exchange for some benefit from the government. That "benefit" included the possibility of outright dismissal of the count pending against him to which he had already pled guilty. Defendants assert that this deal was unknown to them until the government filed its motion, after trial, for leave to dismiss the entire indictment against John Burke. They also contend that notice of the existence of this deal was withheld from them contrary to the mandate of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. Had they known of the actual arrangement, defendants argue, they could have effectively, or more effectively, impeached John Burke's credibility before the jury. Because John Burke provided powerful incriminating testimony, it was critical that any possible motivation for exaggeration or outright lying be put before the jury.

The government, on the other hand, asserts that there was no explicit or implicit deal with John Burke, and no sub rosa understanding, and, therefore, there is no "newly discovered evidence." This is so, the government argues, because the United States Attorney for the District of New Hampshire steadfastly refused to commit to do anything specific for John Burke in exchange for Burke's agreement to testify in the case beyond extending immunity. Rather, the prosecution says it took the position that it would agree to no deal in exchange for Burke's testimony — but, if Burke did testify voluntarily and told the truth (in the government's judgment) then the prosecution would

4

consider doing something for Burke — likely recommending leniency at sentencing on the count of conviction (Burke had been adjudicated guilty upon acceptance by the court of his earlier plea) but neither agreeing to nor foreclosing any possible benefit. Thus, the government argues, John Burke's position was no better than, and no different from that of any witness pending sentencing and voluntarily cooperating with the government without an agreement: he had a hope or reasonable expectation that his truthful testimony might win him favorable treatment, perhaps a favorable recommendation on sentence and a shorter prison term, maybe more — a hope or expectation obvious to everyone, including defense counsel, and one defense counsel thoroughly explored on cross-examination. Likewise, the government says, it too was in the same position it is always in when evaluating any witness's voluntary cooperation and testimony: it could make or withhold a favorable sentencing recommendation as it chose, and it could even dismiss all pending charges.[1] Since the possibility of outright dismissal by the prosecutor is inherent in every case, the government continues, there was nothing about John Burke's situation that was either unknown to the defendants, or that had to be disclosed, and,

---

[1] Although the court expressed its doubt and disagreement at hearings held on the motion for leave to dismiss all charges against John Burke, the government took the position that for all practical purposes it holds virtually unreviewable power to dismiss criminal charges (even after a guilty plea and an adjudication of guilt) in its discretion, and that the requirement that it first obtain leave of court is little more than a formality, assuming the absence of bribery or similar fundamental corruptions of the court's processes.

5

accordingly, there can be no "newly discovered evidence" regarding Burke's situation warranting a new trial for these defendants.

Each defendant was represented by experienced and talented criminal defense counsel, and, predictably, John Burke was effectively and thoroughly cross-examined about his biases and his motivation to testify. It was brought out before the jury that while he himself faced a stiff sentence based on his own conduct (albeit statutorily limited to imprisonment for twenty years), he nevertheless hoped for a lighter sentence due to his general cooperation, the testimony he was giving against his former co-defendants, and an anticipated favorable recommendation on sentence by the prosecutors. All of that was generally understood and thoroughly explored in detail by counsel for the defense and the prosecution before the jury. For example, John Burke was grilled about his personal interest in testifying in a manner favorable to the prosecution's case:

> Q. When you pleaded guilty back in October, you knew it was up to the judge to determine your sentence; correct?
> A. Yes.
> Q. And you knew that the federal Sentencing Guidelines would be used by the judge to determine your sentence; correct?
> A. Yes.
> Q. And you also knew that with your criminal record that you would be in the upper stratosphere of the range of possible sentences; correct?
> A. Yes.
> Q. And the max is 20 years. That's the most you could get; correct?
> A. Yes.
> Q. And the only way that you could get out from under that 20 years plus whatever time you're serving

6

on your Massachusetts sentence, is to come in here and testify; correct?
          A.   Yes.

(Trial Tr., Day 40, United States v. Stephen G. Burke, et al., Cr. No. 96-50-01-05-M (D.N.H. November 18, 1997) at 100-101.)

The government assistance Burke hoped to gain by his testimony was explored on cross-examination, but that effort focused on two basic types — a favorable recommendation on sentencing, and perhaps some help in reducing the unrelated sentence he was already serving in Massachusetts.

          Q.   You understand that to get substantial assistance under the Sentencing Guidelines you have to assist the government substantially in the investigation or prosecution of another person.  You understand that don't you?
          A.   Yes.
               . . .
          Q.   You want a favorable recommendation from [the government] on your sentence on the Hobbs Act, single Hobbs Act charge that you're awaiting sentencing on; right?
          A.   Yes.
          Q.   And you want favorable, favorable help from them, you want assistance from them on the sentence that you're presently serving out of Massachusetts, do you not?
          A.   I would like that, yes.

(Trial Tr., Day 40, United States v. Stephen G. Burke, et al., Cr. No. 96-50-01-05-M (D.N.H. November 18, 1997) at 196-98.)

What was not explored on cross-examination was the possibility that the government would actually move to dismiss all charges against John Burke, i.e. let him walk freely out the door with regard to all charges pending against him in this court.  Such a possibility was probably not anticipated by defense counsel (and certainly was not contemplated by the court

7

as being within the universe of realistic possibilities).  Given John Burke's lifelong history of violent crime and his earlier provident naked plea of guilty to a crime involving the violent armed robbery of an armored car in Seabrook, New Hampshire, defense counsel cannot be faulted for not anticipating that the prosecution might actually contemplate rewarding Burke with a complete walk.

Indeed, it is difficult to imagine that the government ever contemplated dismissing, much less explicitly or implicitly agreed to dismiss, all charges against Burke if his testimony proved useful and truthful in the prosecutors' judgment.  The prosecutors do deny it — or at least deny any agreement or understanding to that effect.  The prosecutors insist that no agreement existed and no understanding existed regarding any quid pro quo for John Burke's testimony, beyond the universally recognized expectations — i.e. if useful and truthful testimony is provided it is reasonable for the cooperating defendant to expect some favorable action (usually in the form of a sentencing recommendation) from the government (not obligatory action, but favorable action emanating from simple concepts of fairness).  Of course, the government also readily concedes that "nothing was foreclosed" either, that is, no potential favorable action was agreed to, and none was ruled out.

At most then, the record shows that there was an understanding between the government and John Burke that while nothing was promised, nothing was ruled out either.  That

8

understanding is the source of the problem — should prosecutors have told defense counsel that "nothing was ruled out" by way of potential action favorable to Burke should his voluntary cooperation and testimony prove truthful and useful to the government?  The prosecution argues that every defense counsel knew or should have known that the government held the power to dismiss all charges, and defense counsel could easily have cross-examined John Burke about that possibility.  While perhaps a plausible argument, the court believes that a reasonably astute and sophisticated criminal defense attorney would have immediately put any such possibility into the frivolous notion bin under the circumstances of this case.  Defense counsel cannot be expected to have either anticipated or inquired into that possibility in the real world setting of this trial, where a serious lifelong violent criminal was testifying voluntarily, after having pled guilty to a serious violent felony, with no enforceable plea agreement other than one to drop remaining charges.

Under the circumstances of this case, disclosure by the prosecution, although not compelled by Brady, ought to have been made if, before Burke testified, the prosecutors even remotely considered the possibility that they would seek to dismiss all charges against Burke should his testimony prove to be extraordinarily useful and (as the prosecutors say) extraordinary in regard to its truthfulness.  Simply as a matter of better practice, the prosecution should have disclosed the understanding

9

that while nothing was promised John Burke, neither was anything foreclosed up to outright dismissal.

However, even assuming that the prosecutors were obligated to make that disclosure to defense counsel under the circumstances of this case, the defendants are still not entitled to a new trial. They are not entitled to a new trial because even if explicit disclosure of that possibility had been made,[2] it is still not reasonably probable that the verdicts would have been any different. See Sepulveda, 15 F.3d at 1220.

Defendants argue that disclosure of the possibility of outright dismissal in John Burke's case would have enabled them to further undermine, even completely undermine, John Burke's credibility. But the fact that Burke hoped or fully expected his testimony would curry favor with the government, and would directly lead to a substantially lesser punishment for him, was thoroughly explored before the jury. It was made very clear to the jury that John Burke indeed expected the government's assistance and thought he might be out of prison in the very near future, and the jury was aware that his testimony should be considered in light of that obvious motivation. For example, John Burke testified as follows:

> Q. In terms of your expectations, sir, for a reduced sentence, Lisa [Burke's girlfriend] has been asking you about your cloth[es] sizes; correct?

---

[2] The lead prosecutor agreed that it would not be unfair or unreasonable for the court to henceforth advise every criminal jury that a cooperating witness facing federal charges might even obtain complete dismissal of all charges on motion by the government should his cooperation be judged extraordinary.

                A.    Yes, that's correct.
                Q.    You've been talking with her about how soon
        you might be able to get out of jail; correct?
                A.    Yes.
                Q.    And she thinks there's a very real
        possibility that you could be home very soon; correct?
                A.    Yes;
                Q.    She's mentioned three to five years; correct?
                A.    Yes.
                Q.    And that's your expectation, correct, or
        less?
                A.    That's my hope.

(Trial Tr., Day 40, United States v. Stephen G. Burke, et al.,

Cr. No. 96-50-01-05-M (D.N.H. November 18, 1997) at 104-105.)

It was also made clear to the jury that it was this hope of

imminent freedom that motivated his testimony.  He was asked:

                Q.    And that's part of what put you there in [the
        witness] chair.  Because you know that if you get a 20-
        year sentence or a 21, 22-year term of imprisonment
        before you get back out onto the street [Lisa] and your
        sons will be long gone.
                A.    That's true as it pertains to my sons . . . .

(Trial Tr., Day 40, United States v. Stephen G. Burke, et al.,

Cr. No. 96-50-01-05-M (D.N.H. November 18, 1997) at 164.)

        Evidence as to how the government might assist John Burke in

reducing his exposure to prison - whether by recommending a

lighter sentence to a judge or by moving for leave to dismiss the

remaining charge against him - would have added little more to

the thorough cross-examination of his likely motives.  Burke's

possible motives and intent in testifying were perfectly clear to

the jury:  he could well be providing exaggerated or even false

testimony in the expectation of obtaining favorable treatment

later, in the form of substantially less time in prison than

otherwise would be the case.  To be sure — questions that

11

explored his hope or expectation that all pending charges would actually be dropped, or that revealed that the prosecutors had "not ruled that possibility out" might have added something to the jury's evaluation. But, "impeachment evidence, even that which tends to further undermine the credibility of the key government witness whose credibility has already been shaken due to extensive cross-examination, does not create a reasonable doubt that did not otherwise exist when that evidence is cumulative or collateral." United States v. Hahn, 17 F.3d 502, 510 (1st Cir. 1994) (internal quotation marks omitted).

Additional impeachment evidence related to John Burke's expectation that his trial testimony might actually lead to a motion to dismiss all counts against him (whether based on an "understanding" that "nothing is ruled out," or simply on a wish and a hope) while something different and something additional, would still have been essentially cumulative, and, had it been presented to the jury through direct or cross-examination, the trial result would not plausibly have been different for any defendant.

The defendants also seek a new trial on the basis of United States v. Singleton, 144 F.3d 1343, vacated sua sponte & reh'g en banc granted, 144 F.3d 1343, 1361 (10th Cir. 1998). In Singleton, a panel of the Tenth Circuit Court of Appeals held that a plea agreement between a federal prosecutor and cooperating witness, providing for leniency in return for testimony in the trial of a coconspirator, violated the

12

prohibitions found in 18 U.S.C. § 201(c)(2).  <u>Id</u>. at 1352.
Within ten days of the panel decision, however, the Court of
Appeals <u>sua</u> <u>sponte</u> vacated that opinion and granted a rehearing
<u>en</u> <u>banc</u>.  This court declines to adopt the reasoning of the now-
vacated panel opinion.  <u>See</u>, <u>e.g.</u>, <u>United States v. Masciandaro</u>,
1998 WL 814637 (S.D.N.Y. Nov. 19, 1998); <u>United States v. Duncan</u>,
1998 WL 419503 (E.D. La. July 15, 1998).  The defendants' motions
for new trial (document nos. 1015, 1018 and 1049) are denied.

**SO ORDERED.**


_____
Steven J. McAuliffe
United States District Judge

January 4, 1999

cc:  United States Attorney
     United States Probation
     United States Marshal
     Peter D. Anderson, Esq.
     Matthew J. Lahey, Esq.
     Bruce E. Kenna, Esq.
     Douglas J. Miller, Esq.
     Michael J. Iacopino, Esq.
     Bjorn R. Lange, Esq.
     David H. Bownes, Esq.
     Edward D. Philpot, Jr., Esq.