Defendant-Appellant Karen E. Kersey appeals her conviction on one count of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1). Although she identifies only two assignments of error in the Table of Contents of her brief, we find three presented in the body of her argument. First, Kersey contends the State failed to show she was associated with the drug trafficking enterprise upon which her conviction was predicated. Second, she claims the sentence imposed was improper since it was based on the trial court's erroneous finding that the offense for which she was convicted was more serious than the normal case because it was committed as part of an organized criminal activity which is an element of the offense for which she was convicted. Finally, Kersey urges this court to denounce the prosecutor's conduct consisting of considering confidential informants' cooperation when deciding with which offenses, if any, the informants will be charged on grounds that such practice is contrary to the Code of Professional Responsibility and violative of R.C. § 2921.02(C) and a defendant's right to due process.
Kersey's conviction stems from her involvement in a drug trafficking enterprise operated in Miami County, Ohio, by Carl Faehl. Investigation of Faehl's enterprise began after a joint investigation by the Miami County Sheriff's Office and the Drug Enforcement Agency uncovered information implicating Faehl in drug trafficking. Deputy Sheriff Paul Reece of the Miami County Sheriff's Office was the lead investigator in the case. By interviewing several of the individuals involved in the enterprise who had agreed to become cooperating sources, Reece was able to ascertain the extent of Faehl's drug dealings. Although Faehl was involved in trafficking cocaine as well as marijuana, nothing in the record links Kersey to Faehl's cocaine business and, for that reason, we confine our recitation of the facts to that portion of his enterprise involving the distribution of marijuana.
From December 1995 to October 20, 1997, Faehl obtained hundreds of pounds of marijuana from Michael and Ruby Courtright, who procured it from Danny Ganger, a resident of the state of Texas. Typically, the Courtrights would meet Ganger in Tennessee where the exchange of money and marijuana would take place, and the Courtrights would bring the marijuana back to their residence in Troy, Ohio, where it would be stored until Faehl distributed it to others in the enterprise. After the Courtrights moved to Englewood, Ohio, in 1996, they continued to supply Faehl with marijuana in the same manner. A relative of the Courtrights moved into the house in Troy, however, and drug sales between them and Faehl continued to be conducted there as well. On two occasions, the Courtrights flew to Texas where they procured the marijuana, then rented a car with which to transport it back to Ohio. As the organization became established, the Courtrights were permitted to take the marijuana more or less on credit and mail payment for it to Ganger in Texas after the marijuana had been sold in Ohio.
Each time the Courtrights met with Ganger, they purchased twenty to forty pounds of marijuana. Upon their return to Troy or Englewood, the Courtrights stored the marijuana in their garage. Faehl took five to ten pounds of marijuana at a time from the Courtrights eventually distributing approximately ninety percent of the total shipment and permitting the Courtrights to sell the remaining marijuana to friends of theirs in Cincinnati. On occasion, Courtright would deliver the marijuana to Faehl at Faehl's house in Piqua. After receiving the marijuana from the Courtrights, whether it be at the Courtrights' house or his own, Faehl took it to Tim Jolliff's residence in Miami County, where he would weigh the marijuana and repackage it in smaller bags for sale.
Faehl had a network of individuals to whom he sold marijuana in varying quantities, Kersey among them. At trial, Angela Jolliff, ex-sister-in-law of Tim Jolliff, ex-girlfriend of Faehl, admitted drug addict, and cooperating source, testified that she saw Faehl sell some of the marijuana he weighed at Tim Jolliff's house to Kersey. Angela Jolliff stated that each of the ten to fifteen transactions were for one-pound quantities and all took place between December of 1995 and October 20, 1997.
Carl Kent Staten, another member of the enterprise, testified that in the winter of 1996, he accompanied Faehl to Kersey's house near Fletcher in Shelby County, Ohio, on three occasions. Generally, the visits were preceded by Kersey paging Faehl and consisted of Faehl collecting money from Kersey's marijuana sales and delivering a few more ounces of marijuana for her to sell. Staten saw Kersey weighing the marijuana into one-half to one ounce quantities on a scale in her kitchen.
Cooperating source Thomas Taylor testified that in early 1997 he was at Faehl's house in Piqua when Faehl received a telephone call alerting him to an imminent police raid on his house. Faehl and Taylor loaded the marijuana then in the house, approximately three to five pounds, into Taylor's car and drove to a nearby Burger King where Faehl made a phone call. The pair continued in Taylor's car to an apparently uninhabited house in the Shawnee district of Piqua where Kersey awaited them. There, Faehl gave Kersey about a pound of marijuana in exchange for approximately $1,000. Taylor could not remember whether the rest of the marijuana was stashed at the house or if Kersey took it with her when she left, but Angela Jolliff testified that on one occasion she and Faehl were at Tim Jolliff's house when Kersey brought Faehl some marijuana she had been holding for him. Taylor also stated that Faehl had "come up with a joint" after the two men visited Kersey's house.
Mike Courtright testified that he met Kersey in mid-summer of 1996 at Faehl's house in Piqua. Courtright was waiting for Faehl to return to the house with some cocaine which Courtright intended to buy. While Faehl was gone, Kersey arrived and waited as well. Upon his return, Faehl took Kersey into a bedroom from which he conducted much of his drug sales. Minutes later, Kersey left the house carrying a brown paper sack, the contents of which were unknown to Courtright. After Courtright completed his transaction with Faehl, he too left Faehl's house with his purchase concealed in the same type of sack carried by Kersey moments earlier.
Another cooperating source, Melissa Olds, testified that she did not know Kersey but stated she had accompanied Faehl to Kersey's house on one occasion. Olds waited in the car instead of going into Kersey's house with Faehl, and when Faehl returned to the car he told her he had gotten some marijuana.
None of the witnesses testified that they ever saw Kersey sell the marijuana she purchased from Faehl. Angela Jolliff and Carl Kent Staten both testified, however, that they observed exchanges of money between Kersey and Faehl, and Jolliff stated that Kersey sometimes lent money to Faehl.
On November 25, 1997, a joint indictment was issued in the Common Pleas Court of Miami County, Ohio, for twelve of the individuals involved in Faehl's drug enterprise, including Kersey. All were charged with violating R.C. § 2923.32(A)(1) by engaging in a pattern of corrupt activity. Others involved in the drug trafficking ring were prosecuted in federal court. Following a jury trial, Kersey was convicted and sentenced to five years imprisonment. She now brings this timely appeal, advancing three assignments of error.
 I. The evidence was insufficient to support the conviction because the State failed to show that Appellant was associated with the "enterprise". [sic]
In her first assignment of error, Kersey contends the evidence produced at trial was insufficient to support a finding that she participated or was involved with Faehl's drug trafficking enterprise. She claims that because the evidence failed to establish that she engaged in drug trafficking with anyone other than Faehl, her association with the enterprise was never proven.
As a preliminary matter, we observe that in considering a sufficiency of the evidence claim, a reviewing court
 [E]xamine[s] the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. Thus, the test for sufficiency of the evidence is one of adequacy. State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
The statutory provisions relevant to the offense for which Kersey was convicted are as follows:
R.C. § 2923.32(A)(1)
 No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity * * *.
R.C. § 2923.31(C)
 "Enterprise" includes any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. "Enterprise" includes illicit as well as licit enterprises.
R.C. § 2923.31(E)
 "Pattern of corrupt activity" means two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event.
R.C. § 2923.31(I)
 "Corrupt activity" means engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in any of the following:
* * *
(2) Conduct constituting any of the following:
* * *
 (c) Any violation of section * * * 2925.03, * * * [or] 2925.05 * * * of the Revised Code, * * * when the * * * value of the contraband or other property illegally possessed, sold, or purchased in the violation [or combination of violations] exceeds five hundred dollars.
Kersey does not contest the existence of Faehl's drug trafficking enterprise, the fact that she engaged in numerous drug transactions with Faehl during the indictment period, or that the value of the marijuana exchanged in those transactions exceeded five hundred dollars, either individually or collectively. Instead, she claims that the evidence presented at trial does not establish that she transacted drug business with any person associated with the enterprise other than Faehl, and that as a consequence, the State has failed to prove that she was a participant in the enterprise. We disagree.
We do not find, and Kersey does not direct our attention to, any case law that supports her contention that one cannot be found to have been "associated" with an enterprise unless she conducted business with more than one other person in the organization. Instead, she relies on her interpretation of the statutory provisions and definitions noted above, and compares her involvement in the enterprise to that of her codefendants, who each engaged in transactions with Faehl and at least one other member of the enterprise. We are not persuaded.
Kersey argues that the language of the corrupt activity statute precludes a finding that she was involved with Faehl's drug operation in a way that would make her criminally liable under the statute. Specifically, she states that the term "associated," contained in the statute but not defined, imposes a requirement that each participant in the enterprise must be found to have engaged in transactions with two or more other members of the organization before criminal liability may be imposed under the statute. In common parlance, however, the verb "associate" means "to join as a partner, friend or companion * * *," and includes no connotation that interaction between any minimum number of individuals involved needs to take place for association to occur. Merriam Webster's Collegiate Dictionary, Tenth Edition (1997) 70. Furthermore, the legislature's definition of "enterprise," noted above, contradicts Kersey's interpretation of the corrupt activity statute by including within its ambit "any individual," which makes it possible for an enterprise to be composed of a single person. Consequently, reading into the statute a requirement that members of an enterprise must transact the organization's business with more than one other participant, as Kersey urges us to do, would exempt those engaged in enterprises of two or fewer members from any criminal liability under R.C. §2923.32(A)(1). This interpretation would fly in the face of the legislature's clear intent to include smaller enterprises, even those consisting of one individual, within the reach of the corrupt activity statute.
Kersey also distinguishes her activities regarding Faehl's enterprise with that of her co-defendants in an attempt to convince this court that she was not a participant at all. She correctly points out that each of her co-defendants engaged in drug transactions with Faehl and at least one other participant in his drug ring. The fact that the evidence at trial showed that her co-defendants engaged in drug transactions with others in the enterprise is irrelevant to the jury's finding that Kersey's conduct also constituted association with the enterprise. In other words, while it may be true that there was more evidence of her co-defendants' participation in the drug trafficking enterprise, that fact does not negate the evidence against Kersey, nor does it imply that the jury's finding that she was associated with the organization was unsupported by sufficient evidence.
Finally, we note that Kersey's marijuana purchases from Faehl were the basis for the jury's finding that she engaged in at least two predicate offenses as required by the corrupt activity statute. They were not, however, the only evidence of her association with the drug ring. From the evidence produced at trial the jury could also conclude that Kersey took an active role in assisting Faehl in avoiding discovery of the enterprise's drug trafficking by concealing the marijuana he removed from his home after receiving a tip that a police raid was imminent. Furthermore, Faehl's telephone records indicated significant phone activity between Faehl and Kersey, and witness testimony, particularly that of Mike Courtright and Carl Kent Staten, showed Faehl considered Kersey a trusted and dependable participant in the drug trafficking enterprise. Thus, we find that the jury's determination that Kersey was associated with Faehl's drug enterprise was supported by sufficient evidence.
Kersey's first assignment of error is overruled.
 II. The trial court committed an abuse of discretion when it imposed a five year sentence because the court based the sentence on its finding that this case was more serious than the normal case in that it was committed as part of an organized criminal activity, yet that this case was part of an organized criminal activity was a necessary component of the underlying offense; thus the case should be remanded for resentencing.
In her second assignment of error, Kersey contends the trial court erred by sentencing her to five years because her case was more serious than the normal case. Kersey argues that finding her conduct to be part of an organized criminal activity is an essential element of the offense of engaging in a pattern of corrupt activity. As such, the same finding cannot be used as a factor in sentencing which would tend to show Kersey's conduct is more serious than conduct normally constituting the offense.
"A trial court has broad discretion in sentencing a defendant and a reviewing court will not interfere with the sentence unless the trial court abused its discretion." State v. Yontz
(1986), 33 Ohio App.3d 342, syllabus; see also R.C. §2929.12(A). The term "abuse of discretion" implies more than an error of law or judgment, it connotes an attitude on the part of the trial court that is arbitrary, unreasonable, or unconscionable." Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219.
Kersey was convicted of one count of engaging in a pattern of corrupt activity, a second degree felony, for which she could have been sentenced to a term of imprisonment from two to eight years pursuant to R.C. § 2929.14(A)(2). In considering the statutory factors pursuant to R.C. 2929.12, the trial judge stated that Kersey's lack of remorse and denial of any participation in the drug enterprise indicated it was likely she would reoffend. Conversely, the court found certain factors weighed in Kersey's favor inasmuch as they tended to show she was not likely to reoffend. Specifically, the trial judge noted that Kersey had no known juvenile record, had no known prior convictions, and had been a law-abiding citizen for a significant number of years prior to committing her offense. In considering the factors relating to the seriousness of Kersey's offense relative to the normal case, the trial court found that she committed her offense as part of an organized criminal activity, but there was no physical harm to persons or property caused, nor was any such harm intended. After making these observations, the trial court sentenced Kersey to a term of imprisonment of five years.
Kersey correctly states that the only factor tending to show Kersey's offense was one more serious than conduct normally constituting the offense was its commission as part of an organized criminal activity. Were this the only factor the trial court had relied on in imposing sentence on Kersey, the question before us would be close indeed. That particular factor duplicates an essential element of the offense of engaging in a pattern of corrupt activity and therefore does not necessarily suggest that Kersey's conduct was more serious than that normally constituting the offense. The record before us, however, shows the trial court carefully considered other factors as well, and arrived at the conclusion that Kersey's offense, her lack of remorse, and her continued denial of involvement warranted a sentence of five years of imprisonment. On the record before us, we cannot say the trial judge's determination was arbitrary, unreasonable, or unconscionable. Accordingly, Kersey's second assignment of error is overruled.
 III. The conviction must be reversed because the State relied on the testimony of informants who were promised lenient treatment in exchange for their testimony; thus Appellant's due process right to a fair trial was violated.
In her third assignment of error, Kersey urges this court to declare that the prosecutor's agreements with various witnesses in exchange for their testimony denied her due process and a fair trial. In addition, she implies that by engaging in such doings, the prosecutor violated R.C. § 2921.02(C), which prohibits the giving or offering any valuable thing or valuable benefit to a witness in order to improperly influence his or her testimony, and DR 9-102(A)(3), (4), and (5), which Kersey claims forbids a lawyer from engaging in illegal conduct involving moral turpitude, dishonesty, fraud, deceit, or misrepresentation, or conduct that is prejudicial to the administration of justice. Since the cited disciplinary rule relates to a lawyer's obligation to preserve the identity of a client's funds and property and is therefore irrelevant to the question before us, however, we will construe Kersey's argument as one claiming the prosecutor's conduct violated DR 1-102(A)(3), (4), and (5), which forbids the type of attorney conduct described by Kersey.
In making her argument, Kersey directs our attention to the case of United States v. Singleton (C.A. 10, 1998),144 F.3d 1343, vacated pending rehearing en banc, 1998 U.S. App. LEXIS 15451, in which the federal court of appeals declared illegal a prosecutor's promise of leniency to a witness in exchange for his testimony against another. Aside from its vacated status, which Kersey acknowledges, Singleton is distinguishable from the present case because the federal bribery statute at issue there makes it illegal to offer anything of value to a witness for or because of his or her testimony regardless of the offeror's purpose. In contrast, the relevant portion of the Ohio bribery statute states as follows:
R.C. § 2921.02(C)
 No person, with purpose to corrupt a witness or improperly to influence him with respect to his testimony in an official proceeding, either before or after he is subpoenaed or sworn, shall promise, offer, or give him or another person any valuable thing or valuable benefit. (Emphasis added.)
The evidence adduced at trial showed that most of the State's witnesses decided to become cooperating sources and testify against the defendants immediately, or nearly so, upon initial questioning by Detective Reece, and that no promises of any kind were made to them in exchange for their testimony, nor were they being paid for testifying. There were three exceptions. One, Heather Redinbo, who was incarcerated for a probation violation at the time of her testimony, stated that although it was not her motivation for testifying, she had asked the prosecutor to tell to the judge in her case of her cooperation, and that the prosecutor agreed to do so. Redinbo never stated, however, that the "benefit" she was to receive was in any way contingent upon the substance of her testimony. In addition, she acknowledged that anything the prosecutor might tell the judge in her case would not impact her release date and that the only value she saw in having the prosecutor talk to the judge was that the judge would think of her as something more than "a piece of crap." On this record, we cannot say that the prosecutor's purpose in agreeing to speak to the judge in Redinbo's case was to corrupt her or improperly influence her testimony.
The second witness who stated he expected to receive a benefit from testifying was Thomas Taylor, who testified that while the state prosecutor had made no promise or deal with him regarding testimony, the prosecutors in the federal cases against members of Faehl's drug ring had. According to Taylor, he was to receive immunity in exchange for his verification of his own knowledge and involvement in the enterprise and his testimony in the state and federal cases against others in the drug ring. Detective Reece, however, stated Taylor's belief that he would not be prosecuted if he testified was a misunderstanding. Reece further testified that state charges were still being considered against Taylor and other prosecution witnesses. Thus, Kersey's contention that the prosecutor in this case agreed not to charge Taylor in exchange for his testimony is questionable. Furthermore, Kersey does not suggest that the deal, even if it were made, was for the purpose of corrupting or improperly influencing Taylor's testimony.
Finally, Carl Kent Staten's testimony contained numerous contradictory statements, including ones to the effect that: (1) no deals were made between the prosecutor and himself; (2) the prosecutor, Bennett, told Staten he would see what he could do for Staten and his son, who was also experiencing legal difficulties; (3) he fully expected to be prosecuted; (4) he might be prosecuted for a lesser offense as a result of his testimony; (5) the benefit he derived from testifying was dependent on the content of his testimony; (6) the benefit derived from testifying was not dependent on the content of his testimony; and (7) Bennett gave him no promises or guarantees. On this record, it is impossible to conclude that Staten was promised anything in exchange for his testimony or that the promise, if any, was made for the purpose of corrupting him or improperly influencing his testimony.
Kersey also claims that the prosecutor's provision of an airplane ticket for one witness who resided in Virginia at the time of trial, Melissa Olds, was an improper "purchase" of testimony. In our view, however, the transportation arrangement merely permitted Olds, who otherwise would have been unable to testify, to do so. Nothing appears in the record from which we could conclude that the plane ticket was provided in exchange for her testimony, or for the purpose of corrupting or otherwise influencing her testimony.
We note that all of the state's witnesses in Kersey's trial were subject to rigorous cross-examination on the issue of deals they may or may not have struck with the prosecutor by not one but three defense attorneys. Having before it the details of each witness' dealings with the prosecutor, which were brought forth on cross-examination, the jury was free to attach only as much weight to the witnesses' respective testimony as it believed prudent. Moreover, none of the defense attorneys, including Kersey's, thought it necessary to object to any of the witnesses on the basis that their testimony was somehow tainted by the allegedly improper conduct of the prosecutor. For these reasons, we overrule Kersey's third and final assignment of error.
Having found no merit to the errors assigned by Kersey, the jury's verdict and the trial judge's subsequent sentence are affirmed.
BROGAN, J. and WOLFF, J., concur.
Copies mailed to:
James D. Bennett John H. Rion Hon. Jeffrey M. Welbaum